JOHN J. SULLIVAN V. PHILIP DEITER, HENRY WILGER-
MARTH, GEORGE HILLER, AND EDWARD COPPS.

*Trial—Misconduct of counsel.*

On the re-examination of a witness upon whose credibility, and
the weight which the jury should give to his testimony, the
whole defense to the action depended, the attorney for the
plaintiff objected to the testimony as not re-examination, and
added, "I know such things have occurred as a witness going
out and getting posted, and then coming back and testifying.
I do not suppose any member of this bar would do that."
And it is held that such remarks could have had no other
than a prejudicial effect upon the jury, in leading them to
believe, or in suggesting to them, that the witness might have
been tampered with between the time of his examination in
chief and his re-examination, and may have led the jury to
discard the testimony of the witness, and to give weight and
credence to that of the plaintiff, which was directly contra-

dicted by that of the witness, thus influencing the result of their verdict. ·

Error to Gogebic. (Daboll, J., presiding.) Argued April 21, 1891. Decided July 3, 1891.

*Assumpsit.* Defendants bring error. Reversed. The facts are stated in the opinion.

*C. F. Button* and *M. M. Riley,* for appellants.

*Frank F. Kutts* and *Thomas B. Wilson,* for plaintiff.

CHAMPLIN, C. J. The plaintiff, Sullivan, showed to the defendant Copps a mining location in the vicinity of Marenisco, Mich., and entered into an arrangement with him, by which Copps secured a mining option, and he and Sullivan went upon it, and worked together in developing it, as far as it was possible for them to do, and also expended some money, Copps paying out rather more than Sullivan. Copps then wrote to Mr. Deiter, of Chicago, to come up and examine the location, with a view of getting him interested in the option. He came up, and looked over the location, and was satisfied with the prospect, and took some specimens of the ore back with him to Chicago to have them assayed, and in about two weeks he wrote Copps to come to Chicago. He went there with the knowledge of Mr. Sullivan, and entered into an arrangement, which is not shown in the record, with the defendants Deiter, Wilgermarth, and Hiller, under which they were to furnish everything to go on and explore thoroughly, and Sullivan and Copps were to have their living, and have everything furnished. He endeavored to make an arrangement with them by which both he and Sullivan would draw wages, but they refused that, saying that he and Sullivan were to put in their labor against their capital, and were to have a one-eighth

interest each in the option. They were to put in capital to the extent of $10,000 for the purpose of exploring and developing the mine, if one existed there. Mr. Copps states that, on his return from Chicago, he informed Mr. Sullivan of the terms that he had made with the Chicago parties, and that Mr. Sullivan was satisfied with them. Mr. Sullivan testifies that he knew nothing of the arrangement made by Copps with the other parties in Chicago, except what Mr. Copps told him, and that he did not tell him that they were to put in their labor without pay. In the agreement made with the parties in Chicago, the one-eighth interest retained by Sullivan and Copps was to be non-assessable.

The parties went on to develop the mine, and expended $10,000 and upwards. Mr. Sullivan testifies that, when Mr. Copps came back from Chicago, he informed him that he had entered into an arrangement with the other parties defendant to develop the mine, put in their capital, and that he and Copps were to have a one-eighth interest each non-assessable; or, in other words, that nothing should be charged against his interest for exploration until it should become a paying mine. He testifies that Copps claimed to be the superintendent and was representing the company; that he commenced work the next day, which was on the 30th day of August, 1888, and worked until the 14th day of December, 1888. He says that Copps agreed with him that he should receive for his wages $1.25 a day; that he also hired his wife to go to the mine and help work, and agreed that she should have wages at the rate of $40 a month until such time as Mr. Copps' wife arrived, when they should have $20 each a month. He states that he has only received $10 for wages; that he ascertained that his name was not on the pay-roll; that he demanded to be paid wages when the other men were paid who were employed at the mine,

and that Copps told him that he had to pay out so much he did not have enough, but, if he would wait until the next pay-day, he would get it all, but he never received any pay except the $10; that, on or about the 19th day of November, Mr. Hiller came to the mine, when he demanded his pay of Hiller; and Hiller told him that he should not pay him any, and that the arrangement or agreement was that he and Mr. Copps were to put in their labor without wages; and he states that that was the first time he heard of it; that he told Mr. Hiller that he never agreed to do anything of the kind, and demanded his wages right there, and Mr. Hiller refused to pay him; that he continued to work until the 14th day of December, when he sold out his one-eighth interest in the option to Mr. Deiter for $150 cash, and he and his wife left the mine on the 17th of December.

He further testified that his wife commenced work on the 6th day of September, 1888, and worked until the 19th day of October, at $40 a month, and then Mrs. Copps came down, and his wife worked from the 19th day of October until the 17th of December at $20 a month, and that she had assigned her claim against the defendants to him; and in the month of January, 1889, he commenced suit by attachment against all the defendants for the amount which he claimed to be due him and his wife for wages.

Mr. Copps, in his testimony, denies that he hired Mrs. Sullivan to work at all, but says that she did some extra work before his wife arrived, and that he paid the $10 which Sullivan claims was paid on his wages to her for such extra work.

The main question in the case is, to what extent is Mr. Sullivan bound by the arrangement which Mr. Copps made with the parties in Chicago? It is claimed on the part of the defendants that Mr. Copps represented his

own interest and that of Mr. Sullivan in making the arrangement with the Chicago parties, and in regard to such arrangement, as the agent of Mr. Sullivan, and the fact, which is undisputed, that Mr. Sullivan accepted the contract to the. extent of retaining a one-eighth interest in the option, and selling it·to Mr. Deiter, and realizing money upon it, was a ratification of that contract, for the reason that, at the time he made his sale, he was then acquainted with the particulars of the contract, and that, if he wished to repudiate it and receive his wages, he should have done so, but that he cannot · retain his interest, and sell it as an existing interest to Mr. Deiter, and repudiate the contract which they made with reference to his wages and those of Mr. Copps; that, if Mr. Copps made the agreement which Mr. Sullivan claims he did with regard to wages, it was done without their authority and without their knowledge, and that they never had recognized it as binding upon them.

But it appears from the testimony that the defendants, Deiter, Wilgermarth, Hiller, and Copps, constituted the firm of Philip Deiter & Co., and, if they were a copartnership, Mr. Copps, as a member of the firm, would have a right to make any contract which was proper to carry out the objects of the partnership, and the hiring of men and agreeing upon the terms upon which they were to be paid would come within the scope of the partnership dealings, and it would not be competent for the defendants to repudiate his authority to hire the plaintiff to work for the company, although they had agreed between themselves that the plaintiff should work for nothing. The interest which he held in the option would not prevent him from hiring out to the company for wages, nor is there anything in the record which discloses that his retaining such interest would constitute him a partner with the others in prosecuting the work.

According to the plaintiff's testimony, that interest was retained for him as a reward for his discovering the location. Had the agreement which was entered into by and between the defendants been introduced in evidence, we should have been enabled to determine the rights of the parties under it, and it would show whether or not Copps was a copartner with the other defendants, and as such authorized to enter into the contract of hiring declared upon. As a partner, he would also have a right to hire Mrs. Sullivan to labor for the partnership, and there does not appear to be anything contained in the agreement which would militate against his authority to hire her. The record is very indefinite and unsatisfactory, but it rests upon the plaintiffs in error to show that error has been committed.

Error is assigned also upon the conduct of the plaintiff's attorney during the trial of the cause. Upon the cross-examination of Mrs. Copps, counsel for defendant asked this question:

"*Q.* Now, let me see if I understand you. I understood that you made this contract the 5th of September?

"*Mr. Kutts:* You know that the talk had been had with her husband before. What is the use of undertaking to mislead this witness?

"*Mr. Riley:* I object to that. The witness is on the stand on cross-examination. Will your honor note a formal exception to the remarks of counsel?

"*The Court:* Yes; but I do not think it will prejudice you very much."

Again, upon the redirect examination of the witness Copps, he testified that "it was understood on the start that we were not to get wages, and Sullivan never said anything about them.

"*Q.* Did you have a conversation with Mr. Sullivan at any time in which Mr. Sullivan requested you to put the

names of fictitious persons on the pay-roll, so that you and he could get pay?

"*Mr. Kutts:* I object to it, if it please your honor, for at least six reasons. The first is, it is grossly, outrageously, and indecently leading; it is also immaterial."

And thereupon the counsel for defendant excepted to the remarks of counsel in objecting to the question as grossly, outrageously, and indecently leading.

"*The Court:* The proper question to this witness is to ask him if he has given all the conversation that he can remember; I do not think he has said that yet.

"*Q.* Have you given all the conversation between you and Mr. Sullivan that you can remember in relation to his pay?

"*A.* Well, we had a conversation once. He wanted me to put in a bill for their stove.

"*Mr. Kutts:* That is not the question; you are altogether too fresh.

"*The Court:* The question asked you was whether you had given all the conversation you could remember between you and Mr. Sullivan on the subject of his wages.

"*A.* No, sir.

"*Q.* What other conversation did you have with him, and the time it took place?

"*A.* Well, we were talking one day about—

"*Mr. Kutts:* I wish to make the objection here that this is not re-examination. I know such things have occurred as a witness going out and getting posted, and then coming back and testifying. I do not suppose any member of this bar would do that;" to which remarks the said counsel for defendants did then and there except.

"*The Court:* Gentlemen of the jury, you are to decide this case on the evidence, and what the witnesses say, and not what counsel say."

The language of the attorney for the plaintiff during the progress of the trial, as above shown from the record, cannot be justified, especially the objection which he made to the re-examination of the witness Copps. This witness was a material witness for the defendants, and upon his credibility, and the weight which the jury should give to his testimony, depended the whole defense

to the action. His testimony directly contradicted that of the plaintiff, Sullivan, and the remark of counsel could not have had other than a prejudicial effect upon the jury, in leading them to believe, or in suggesting to them, that the witness might have been tampered with between the time of his examination in chief and his re-examination. It may have led the jury to discard his testimony, and to give weight and credence to that of the plaintiff, thus influencing the result of their verdict.

In *Rickabus v. Gott*, 51 Mich. 127, this Court held that "the duty of the trial judge to repress needless scandal and gratuitous attacks on character is a very plain one, and good care should be taken to discharge it fully and faithfully." See, also, as bearing upon this question, *Bond v. Railroad Co.*, 62 Mich. 643; *Cronkhite v. Dickerson*, 51 Id. 178; *Wheeler v. Wallace*, 53 Id. 356, 364; *People v. Hare*, 57 Id. 506.

The jury found a verdict for the plaintiff in the sum of $223.86, which amount exceeds the sum which the plaintiff is entitled to recover under his testimony. He states that he commenced work on the next day after the 29th day of August, 1888, which would be the 30th, and that he worked until the 14th day of December. This would make a total of 107 days, but there should be deducted therefrom 15 Sundays, leaving 92 days, at $1.25 a day,—a total of $115; from which should be deducted $10, which he admits he was paid, leaving $105. According to the testimony, his wife commenced work on the 6th day of September, 1888, and worked until the 19th day of October, at $40 a month, for a month and 13 days, amounting to $54; and she worked from that time to the 17th day of December, at $20 a month, for 1 month and 28 days, amounting to $38.67, making a total of $92.67, which, added to the $105, makes $197.67. If he be allowed interest from the 17th

day of December until the day the suit was commenced, it would amount to $13.23, making a total of $210.90, instead of $223.86, as the jury found. Whether the amount of their verdict be the result of error, or whether they added something which does not appear in the record, cannot be ascertained.

We think that, for the error pointed out with reference to the manner in which the cause was tried, the judgment should be reversed, and a new trial ordered.

McGrath, Long, and Grant, JJ., concurred. Morse, J., did not sit.