125    647
s85NW 109
e133 ² 41

1. WILLS — CONTEST — MENTAL INCAPACITY — STRIKING OUT EVI-
   DENCE.
   Where evidence of testator's conduct some seven years before
   his death and the execution of the will is admitted in a will
   contest on the statement of counsel that the acts so testi-
   fied to, and tending to show mental aberration, will be
   shown to continue until the time of testator's death, but
   no evidence showing the continuance thereof is introduced,
   it is error to fail to strike out such evidence.

2. SAME—PHYSICIAN'S OPINION.
   Where it is contended that a testator was not of sound mind
   when he executed his will, between 10 and 11 o'clock in the
   forenoon, a physician who attended him shortly after noon
   of the same day, and who testifies to his mental condition at
   such time, which is not shown to have differed materially
   from his condition at the time of the execution of the will,
   may give his opinion of testator's mental capacity at the time
   of such examination.

3. SAME — BENEFICIARY AS WITNESS — CROSS-EXAMINATION — IM-
   PROPER QUESTIONS.
   Where the sole beneficiary in a will testifies in a contest
   thereof, but her husband is not a witness, it is error to com-
   pel her to state on cross-examination how many times her
   husband has been arrested in the last seven years and since
   their marriage, and how many times she has been a witness
   for him.

4. SAME.
   Where the sole beneficiary in a will bequeathing all of tes-
   tator's property, consisting of bank deposits to the amount of
   $5,000, testified, in a contest thereof, that the testator, her
   father, after making the will, handed her his bank books,
   stating that they were hers, and that his other children had
   had their shares, it was improper cross-examination to ask the
   witness if, admitting her claim that each of her brothers and
   sisters had received in testator's lifetime sums of $500 to
   $1,000 each, she thought it would be the right thing for her
   to take $5,000.

5. SAME—UNDUE INFLUENCE.

Where, on the contest of a will bequeathing all of testator's property to a daughter, all of the testimony relating to its execution was to the effect that the daughter, during testator's last illness, had the will so drawn at his request, that it was read over to him, and signed by him in the presence of three acquaintances, who signed as witnesses, it was error to refuse to charge that there was nothing to show undue influence.

6. SAME—WITNESSES—WEIGHT OF EVIDENCE.

Where several witnesses testified that testator, at the hour the will was executed, showed no signs of mental aberration, it was error to modify a requested instruction that such evidence, if true, showed mental capacity, by the statement that the opinions of witnesses who saw the testator several hours later might be considered in opposition thereto.

7. SAME—EXECUTION—SUBSEQUENT INSERTION OF DATE.

A will is not rendered invalid by the fact that the daughter of testator, who is the sole beneficiary therein, inserts the correct date at the request of the testator on his discovering that it has been omitted.

Error to Wayne; Donovan, J. Submitted October 3, 1900. Decided February 12, 1901.

Frederika Lange presented for probate an instrument purporting to be the last will and testament of Henry Wiegand, deceased, to the allowance of which Henry J. Wiegand and others filed objections. The instrument was disallowed in the probate court, and proponent appealed to the circuit court. From a judgment for contestants, proponent brings error. Reversed.

*Bacon & Yerkes* and *T. E. Tarsney*, for appellant.

*James H. Pound*, for appellees.

LONG, J. Henry Wiegand died in the city of Detroit August 21, 1896, leaving an estate consisting of $1,554.83 deposited in the Wayne County Savings Bank and $2,960.95 deposited in the Detroit Savings Bank. Shortly before his death he made a will, leaving all his property to his daughter Frederika Lange, the proponent. She filed the

will for probate, and on the hearing in the probate court
the other children of Henry Wiegand, to wit, Henry J.,
William, and John Wiegand, and Catherine Karmann,
filed objections to the probate of the will. The probate
court refused to admit the will to probate. An appeal
was taken to the circuit court of Wayne county, and was
there heard before the court and a jury. The jury found
against the proponent. She brings the case into this court
by writ of error.

The objections filed to the probate of the will are:

1. That, at the time of the execution of the will, Henry
Wiegand was not of sound mind and disposing memory.

2. That, at the time of the alleged signing of the will, the
said Henry Wiegand was a mental wreck, incapable of
appreciating the same.

3. That, if the will was ever signed by Henry Wiegand,
his signature was procured by undue influence.

4. That the will was never signed or witnessed as re-
quired by the laws of this State.

5. That, if he ever signed it, it was procured from him
by fraud, and without his knowing or understanding what
it was.

It appears from the testimony offered by the proponent
that the testator was taken sick some time in the night of
the 18th and 19th of August, 1896; that, at about 5 o'clock
in the morning, he awakened his daughter, the proponent,
and told her that he felt sick, but that at that time he was
up, and around the house; that about 8 o'clock he re-
quested her to send over for a neighbor, Henry Kamp, to
come and stay with him, and also directed her to go and
have a will drawn; that, after Mr. Kamp came, she went
to the office of Mr. Willcox, and informed him that her
father wished to have a will drawn, and wanted to leave
whatever property he had to her; that Mr. Willcox drew
the will, and she returned home, arriving there between
10 and 11 o'clock in the forenoon; that, at the request of
the testator, the proponent went downstairs, and asked
Nicholas Burns and H. Cohen to come upstairs; that they
did so, and Mr. Burns, at the request of the testator, read

the will over to him; that the testator signed it, and Mr. Kamp, Mr. Burns, and Mr. Cohen, at the request of the testator, signed the will as witnesses in his presence; that, after the will was signed and witnessed, the testator said it was his will; that, after he had signed the will, he requested the proponent to get his pants; that she got them, and he took a key out of the pocket, and opened a satchel, which he directed her to get; that the testator took out of the satchel two bank books, and handed them to her, telling her to take them, that they were hers, and at the same time stating that his other children had had their shares.

Mr. Kamp testified that he had known the testator in his lifetime since 1857 or 1858, and had been intimate with him; that, for about six weeks or two months before his death, he saw him every day, and that he told him a number of times that he was going to make a will, and give what he had to his daughter Rika, the proponent. Harris Cohen testified that he had known the testator five or six years prior to his death; that he was of sound mind at the time of the execution of the will and during all the time he knew him. Andrew Strong testified that he had lived in the city of Detroit for eight years, and knew the testator; that prior to that time he lived in the township of Taylor, where the testator lived, from 1866 or 1867 up to the time of his coming to Detroit, eight years before; that the testator held the office of justice of the peace in that township; that he was a man of sound mind at the time of the execution of the will; that he met him many times in Detroit, and had had a conversation with him about two weeks before he died, in which he stated that what he had left of his property would go to the proponent. Several other witnesses were called, who had known the testator in the city of Detroit and up to the time of his death, who testified that he was of sound mind up to the time of the making of the will.

The contestants called several witnesses, who testified that the testator was not of sound mind. Some of this testimony was objected to on the ground that these wit-

nesses had not known the testator since the time he left
the farm, in 1889, some seven years before the will was
made.   The court admitted this testimony upon statement
made by counsel that several acts stated by the witnesses,
which they thought were some proof of mental aberration,
would be shown to continue down to the time of the death
of the testator.   This, we think, they wholly failed in
doing.   Nothing was shown by these witnesses which
had any bearing on testator's competency during the time
he lived in Detroit.   The court should not have permitted
this testimony to be given, or at least should have stricken
it out, unless some testimony was offered showing the con-
tinuation of such claimed mental aberration up to or near
the time of testator's death.

It appeared from the testimony that, soon after this will
was executed, the testator began to fail rapidly, and there
is some testimony tending to show that in the night prior
to the making of the will he had a slight stroke of
paralysis.   Dr. Yates was called in the afternoon after
the will was executed.   He was asked whether, in his
opinion, the testator had sufficient capacity to make a will.
This was objected to as incompetent and immaterial.   The
objection was overruled, and the doctor permitted to
answer the question.   It is claimed that Dr. Yates was
not possessed of sufficient information to admit his opinion
as to the competency of the deceased.   It appears that the
will was signed in the forenoon.   The witnesses for pro-
ponent do not agree as to the time, but one witness states
it as between 10 and 11 o'clock.   The doctor testifies as to
the time of his attendance, and as to what he discovered,
as follows:

"I do not remember the exact time of day,—exactly
when I was called in.   It was about noon; not before
noon.   I was associated with Dr. Baker at that time, and
had an office in the same building.   I found Mr. Wiegand
in the bedroom, lying on the bed.   I think I was there
twice the first day that he was sick, in the afternoon; and
I was there with Dr. Baker on the day the old gentleman
died.   When I first went there, I diagnosed the trouble

with Henry Wiegand as apoplexy.   At any time while I
was there I did not get an intelligent word out of him.   I
did not hear him speak at all.   I saw Mrs. Lange there at
the time.   I had a talk with her, and, to the best of my
knowledge and belief, the impression I got was that he
had been in the same condition from early in the morning.
I asked Mrs. Lange if he had spoken at that time, and she
said, 'No,' although she said that he was against my
coming and against her calling for any physician.   I do
not remember anything else in particular.   My impression
is now that he was taken ill that morning, and that he
was getting worse, and consequently I was called.   At
the time I was there, I found no movement in his limbs.
He could move his head, could drink, could swallow, and
could move his lips.   I gave him some medicine at that
time.   I gave him restoratives, but did not give him any
whisky or stimulants of any kind.   When I was there his
eyes were partially motionless, and yet he could see, and
I knew he could see.   He would look at you, and, although
he was looking at you, his attention would not be called
sufficient to turn his head.   He would see what you were
doing if you sat within a certain radius of his vision.   He
had a partial intelligence, for he would. take something if
I offered it to him.   I endeavored to speak to him as I
would to anybody else, first trying to find out how keen
his brain was; and I found I had to speak very decidedly,
sharp, and quick, to attract his attention; and I found
by sharply doing this he would open his lips, when I
would tell him that I wanted him to take some medicine,
and would open his mouth.   I had a conversation with
Mrs. Lange the first time I was there.   She said that it
was the old man's intention of giving her all the property,
and asked me if I thought he would be able to transact
any business in the way of signing papers, and if- it would
be possible to restore him to that extent, and I told her I
thought it was decidedly problematic; it was improbable.
She did not say anything at any time about his having
made a will."

In view of this testimony, we think it was clearly com-
petent for the doctor to express an opinion as to the
mental capacity of the deceased at the time he saw him.
It did not conclusively appear that the condition of Mr.
Wiegand had changed so materially after the time of
making the will that the opinion of Dr. Yates as to his

mental capacity at the time of his visit was wholly without force.

Frederika Lange was called as a witness in her own behalf. She testified to the testator's condition at the time the will was executed, and the passing over to her of the bank books in the presence of the three witnesses to the will. On her cross-examination she was asked:

"How many times has your husband been arrested in the last seven years?

"How many times have you been a witness for him?

"I want to ask you a fair question,—whether or not you know he has been arrested.

"How many times has he been arrested since your marriage?

"Now, admitting that you claim that Henry got $1,000, that William got $1,000, that your sister got $500, and that you got nothing, so that, about to square you up, would be about the right thing for you to take $4,500 or $5,000, you think, do you?"

All these questions were objected to as incompetent and immaterial, the objections overruled, and the witness required to answer them. Mr. Lange had not been produced as a witness, nor had he given any testimony on the trial. The court should not have permitted these questions to be answered. They had no legal connection with the issue being tried, and the contestants had no right to discredit the witness by such questions. In *People* v. *Cahoon*, 88 Mich. 456 (50 N. W. 384), the questions put to Mrs. Cahoon were: "Is it not a fact that you and your husband have concocted this whole story?" "You have been a witness for your husband in every lawsuit he has had, have you not?" It was held that these questions reflected upon the character of the witness, and should not have been permitted. See, also, *Sullivan* v. *Deiter*, 86 Mich. 404 (49 N. W. 261), and *People* v. *Gotshall*, 123 Mich. 474 (82 N. W. 274).

The court was asked to charge the jury that there was no evidence tending to show that Henry Wiegand was unduly influenced to make the will in question. This was refused, and the court charged the jury:

" If the jury are not satisfied from the evidence that the paper here offered for probate is the last will and testament of Henry Wiegand,—is not in fact the product of his own free will, but of influence that constrained him to do against his will what he was unable to refuse,—your verdict will be for the contestants."

We are unable to find any testimony in the record tending to show that there was any undue influence operating upon the mind of the testator at the time of the execution of the will. All the witnesses who knew or could know anything of the circumstances under which the will was executed testified that it was read over to him, and, after being so read, he signed it, and at once passed the bank books over to his daughter, telling her that they belonged to her. The daughter testified that she had the will drawn as directed by her father, and returned it to him for his execution; that he executed it in the presence of the three witnesses; and no testimony was given upon the cross-examination of the proponent tending to show undue influence, and the contestants themselves offered no such testimony.

The court was asked to charge the jury:

" If the statements made by these several witnesses are true, they clearly show sufficient mental competency in Henry Wiegand to make a valid will."

This was refused, and the court charged the jury:

" If the statements made by the several witnesses Kamp, Burns, and Cohen are true, they show sufficient mental capacity in Henry Wiegand to make a will. Over and against that you put the statements of what the doctors say, and what they say about his not having awakened sufficiently to speak, and so forth. These matters you can remember."

This was error. The doctors did not see Wiegand until the afternoon of the 19th of August. The will was made between 10 and 11 o'clock in the morning of the same day. He was failing rapidly from a stroke of paralysis. His condition, according to the testimony of several witnesses

for proponent, was not alarming while the will was being signed. He lay propped up in bed, and, though his right arm and hand were considerably affected, they testified he could talk, and that he bore no evidences at that time of mental aberration. In the afternoon, however, his condition very much changed. What his condition was at that time could not be weighed against the testimony of witnesses, who stood unimpeached, as to the condition when the will was made.

It is said, however, by the contestants that the will was improperly executed, because the date was put into it after it had been signed by the testator. Under the circumstances shown, this could have no legal effect upon the validity of the will. It was shown that, after the will was executed, Mr. Wiegand, in looking it over, discovered that the date had not been put in. He then directed his daughter to insert the date in the instrument, and she inserted the true date.

For the errors pointed out, the judgment below will be reversed, and a new trial ordered.

The other Justices concurred.