SAMPSON `v. VEENBOER.

1. WITNESSES—EXPERT WITNESS—QUALIFICATIONS—PHYSICIANS AND SURGEONS.

   In action for malpractice based on surgical operation, a surgeon of many years' experience, who had performed operations somewhat similar to one in question, which was not shown to be very unusual, and who had heard defendant's testimony as to practice of surgery in that locality, was qualified to testify as expert, although he lived in a distant city and had never visited hospitals or practiced in this State.

2. EVIDENCE—CREDENCE TO BE GIVEN EXPERT WITNESS IS FOR JURY.

   Where jury were informed of qualifications of surgeon testifying as expert, in action for malpractice, credence to be given to his testimony was for them.

3. SAME—HYPOTHETICAL QUESTION—APPEAL AND ERROR.

   Where hypothetical question propounded by plaintiff's counsel was amended to overcome objection of defendant's counsel, and no further amendments were asked for, there was no error in submitting question to jury.

4. SAME—EXPERT MUST ACCEPT AS TRUE FACTS STATED IN HYPOTHETICAL QUESTION.

   Expert witness, in answering hypothetical question, must accept as true every asserted fact stated therein, but jury may not consider answer of expert unless they find evidence establishes truth of all such asserted facts.

5. NEGLIGENCE—DOCTRINE OF RES IPSA LOQUITUR.

   Doctrine of res ipsa loquitur is not recognized in this State.

6. APPEAL AND ERROR—WEIGHT OF EVIDENCE.

   Supreme Court should not interfere with verdict of jury unless convinced that it is against great weight of testimony.

7. PHYSICIANS AND SURGEONS—MALPRACTICE—NOT LIABLE FOR ERROR OF JUDGMENT.

   If surgeon in performing operation acted within his best judgment, based on surgical skill and experience, and acted in good faith and to best of his ability, and lack of success was due to error of judgment, he would not be liable therefor.

8. SAME—TRIAL—INSTRUCTIONS—REQUESTS TO CHARGE.

> In action against surgeon for malpractice, where there was testimony that lack of success in operation was due to error of judgment in emergency, failure of court to instruct jury, as requested, that defendant would not be liable for honest error of judgment in emergency, was reversible error.

Error to Kent; Perkins (Willis B.), J. Submitted June 19, 1930. (Docket No. 64, Calendar No. 34,980.) Decided January 7, 1931.

Case by Edith Sampson against William H. Veenboer for malpractice. Judgment for plaintiff. Defendant brings error. Reversed.

*Dunham, Cholette & Allaben,* for plaintiff.

*Norris, McPherson, Harrington & Waer (Herbert V. Barbour,* of counsel), for defendant.

BUTZEL, C. J. Edith Sampson, plaintiff and appellee, prior to August, 1923, lived in Flint, Michigan, where her husband worked. After the birth of her first child, who is strong and healthy, she gave birth to a six months' still-born child. Owing to the fact that she was suffering from severe backaches and a vaginal discharge, she was treated by a surgeon of Flint, Michigan, in the early part of 1924. He performed a sub-total hysterectomy, removing the "body" or fundus and the Fallopian tubes on account of their diseased condition. The surgeon did not remove the cervix of the uterus. His deposition shows that the origin of the disease was gonorrhea, for which he had given her local treatment prior to the operation. Both she and her husband denied that either of them had ever suffered from this disease. After the operation her condition im-

proved somewhat for the time being, but the discharge did not entirely stop.

She and her husband moved to Grand Rapids, Michigan, where she also suffered from arthritis, a disease attributed to some focal infection. She continued to suffer from severe backaches, and the discharge. She thereupon went to the University hospital at Ann Arbor, Michigan, where the doctors prescribed a steel brace to wear over the spine and especially made corsets. She left the hospital without being cured, and continued to suffer from backaches and vaginal hemorrhages. She then went to an osteopath for treatment. He directed her to see the defendant, a surgeon of high standing. He found that the cervix was in a very bad condition; that the surface of the vaginal canal was raw and bleeding, and, in his judgment, it looked like the beginning of cancer. He testified that he thought there was a malignant infection, and in this belief he advised the removal of the cervix by surgical operation. This he performed without an abdominal incision. The vaginal canal was distended by means of retractors and then the cervix, after being grasped by a forceps, was loosened from the mucous membrane surrounding it with a sharp-pointed knife or scalpel, the fascia or connecting tissue cut into, and the entire cervix amputated and removed. The entire area was carefully dissected, cleaned, and properly sutured. It is conceded that in this particular instance the position of the cervix was directly next to the bladder, and separated from the bladder wall only by fascia stated by defendant to be only 1/16 of an inch in thickness. In performing the operation, it was necessary to detach the cervix from the bladder wall. The thickness of the bladder wall is a subject of controversy. It differs in individuals and

particularly so if it has been weakened by childbirth, disease, or corrective surgery. Plaintiff's expert claims it is one-half of an inch thick when the bladder is empty and collapsed. The thickness is estimated to be from $\frac{1}{8}$ to $\frac{1}{3}$ of an inch in the various opinions of defendant and his experts. The difficulty that presented itself in the present instance, according to defendant's testimony, was that the granular bleeding and appearance of the cervix made him suspect the beginning of cancer, and in his judgment he had to cut deep so as to remove all diseased parts. He further testified that the cervix was attached to the bladder wall by scar tissue as a result of the operation in Flint when the fundus was removed. After an operation, when a diseased condition continues, as was testified to by the Flint surgeon, and the subsequent events seemed to further confirm, scar tissue forms over a wound. Scar tissue is hard and fibrous, and becomes so interwoven with the adjoining tissue that the demarcation between the two is obliterated. It is admitted that part of the area where the operation was performed can not be seen by the surgeon when operating without an abdominal incision from the outside, and that he must depend upon his sense of feeling and not of sight in making the incision. He used sharp scissors but with blunt ends so as not to cut too deep.

Immediately after the operation the wound was packed with gauze. A catheter was used, but after a few days when the dressing was removed, it was found that micturition was taking place involuntarily. Plaintiff claims that this began within 24 hours after the operation, while defendant asserts it was four days. A vesical fistula or opening appeared in the bladder wall. It is undisputed that

this opening did not become complete at least until the day following the operation. Plaintiff further claims that defendant told her that "he had made a mistake" and had accidentally punctured the bladder; that it was the second mistake of that kind he had ever made. Plaintiff's husband and a Mr. and Mrs. Mort, friends of plaintiff, testified that defendant admitted to them that he had cut a hole in plaintiff's bladder. Defendant denied ever making these statements in the form as testified to. He freely admitted that he had made the statement that he caused an incision in the bladder and that at the time he said it, he was under the impression such was the case; that subsequent investigation proved that he was absolutely mistaken and that he was in no way to blame for the fistula.

The medical testimony showed that the repair of a bladder opening or fistula by suture is neither a difficult nor an uncommon operation, and that while a small cut might heal very rapidly by itself without even any sutures, a larger one, when sewn, heals within a very short period. Defendant claims that the failure of the bladder wall to heal when sutured proved beyond any doubt that it was in a weakened state, a condition he could not foresee, and that the fistula or opening was not due to any incision made by him. Defendant claims that the bladder wall consisted of scar tissue at the point where the fistula developed; and that the fistula was caused by the inherent weakness of the bladder wall which broke upon the removal of the cervix which supported it or else on account of the sutures which a surgeon is obliged to make upon the completion of an operation in order to stop the bleeding and keep the organs in their proper position. He further shows that the subsequent operation on plaintiff indicated that the

bladder wall was in a diseased or weakened condition. Defendant and other surgeons undertook, according to good surgical practice, to sew up the bladder wall seven different times, three of which were by operations performed after abdominal incisions from the outside. When it was found impossible to close the bladder in the manner indicated, plaintiff, with the financial help of defendant, was sent to the hospital of Mayo Brothers at Rochester, Minnesota, where, after another unsuccessful attempt to close the fistula by sutures, the ureters were transplanted so as to connect the kidneys with the sigmoid instead of with the bladder, and micturition now occurs at intervals through the rectum. Before defendant gave plaintiff financial assistance to enable her to go to the Mayo Hospital, she signed a statement to the effect that his aid was not an admission of any negligence on his part.

In addition to the evidence relating to the admissions alleged to have been made by defendant, much stress was placed upon the fact that nothing was stated about scar tissue or the fistula or opening in the hospital charts, both of the operation and the immediate subsequent treatment. However, the report of Dr. Bond, the superintendent of the laboratory, who also testified on behalf of defendant, shows that the tissue which was sent to him for examination showed papilliferous growth, and that the stroma was of the fibrous tissue type. He, however, found no cancerous growth.

To prove negligence, a Dr. Louis Thexton, of Chicago, testified as an expert on behalf of plaintiff. Defendant and a number of prominent surgeons of Grand Rapids attempted to refute plaintiff's claims. A verdict was rendered in favor of plaintiff. A fur-

ther statement of additional facts appears in the discussion of the claims of error made by defendant and appellant.

1. It is claimed that Dr. Thexton did not have the qualifications of an expert, and that his testimony should have been excluded. He was permitted to testify as to the practice of surgery in Grand Rapids and similar communities in western Michigan. He became an interne in a hospital in Aurora, Illinois, in 1891, and, subsequently, the head of the hospital. Aurora was then a city of about 25,000 to 35,000 inhabitants. After seven and a half years, one of which was spent in study in Germany, he moved to Chicago, Illinois, where he opened and conducted several small hospitals, and where he also was assistant to a surgeon of two railroads. During the World war he spent two years as major in the medical corps. He operated in the army hospital at Fort Leavenworth, Kansas, and the general hospital at Cincinnati. He also was an anatomist and at one time a teacher of anatomy at Northwestern University, where he gave practical demonstrations on the cadaver. He visited many hospitals in this country, and one summer visited the hospitals in Europe. He retired from active practice in 1922. He still performs some casual work in the summertime. He claims to have performed probably 100 hysterectomies, and in a few cases to have removed only the cervix without disturbing the fundus. He never removed a cervix where the fundus was previously removed. He never visited the hospitals or practiced medicine or surgery in the State of Michigan. He, however, stated that he knew about these hospitals in a general way through having heard defendant testify that the hospitals in Grand Rapids were class "A" hospitals. This was stricken out.

The defendant testified in his presence that:

"There are about 20 fellows of the American College of Surgery in Grand Rapids. Grand Rapids as a surgical center or locality stands very high."

This in itself would give the witness a good idea of the standard of surgery in Grand Rapids. After giving these qualifications, the expert was asked whether he was "familiar with the standards of surgery of the average practitioner of surgery in localities and communities similar to Grand Rapids." He testified that he was. Thereupon, his testimony was admitted. The fact that he was a man of experience and had performed somewhat similar operations, even though not the identical one in question, and the further fact that it was not shown that this was a very unusual operation, and the further knowledge that he obtained in the court-room listening to defendant's testimony in regard to the practice of surgery in Grand Rapids, were sufficient to qualify him as an expert. The jury was sufficiently informed so as to be able to judge the extent of his qualifications and to decide how much credence should be given to the testimony. At times it may become necessary to secure the expert testimony of one who resides some distance from the home of a defendant accused of malpractice, for it may be difficult to obtain a witness to testify against one who bears the very high professional reputation of defendant. If it would always be necessary to secure an expert from the vicinity of the home of a defendant who might be the only practitioner there, it would be impossible to secure such testimony at all. What credence should be given to the expert's statements is another matter. That was the province of the jury.

2. Error is claimed that the hypothetical question propounded to plaintiff's expert by her counsel was incomplete and did not represent all the facts in the case. The question was very lengthy. From the record, it appears that plaintiff's counsel undertook to cover all the material facts in the case as presented by him. Defendant's counsel objected to the question because it assumed that the bladder had been punctured and it omitted all reference to defendant's claim that the bladder had been weakened so that the fistula developed. Plaintiff's counsel thereupon overcame this objection by including the point thus raised. No further amendments were asked by defendant's counsel. We find no error in permitting the question. As was said in *Ballance* v. *Dunnington,* 241 Mich. 383:

"It should be remembered that an expert witness, in answering a hypothetical question, must accept as true every asserted fact stated therein, but the jury cannot consider the answer of the expert unless they find the evidence establishes the truth of all such asserted facts. If the hypothetical question goes beyond the evidence it defeats itself and affords an excellent opportunity for argument before the jury to that effect."

3. Error is claimed in that the judge refused to direct a verdict in favor of the defendant or else set it aside as being against the great weight of the testimony. This is difficult for us to decide. The doctrine of *res ipsa loquitur* is not recognized in this State. *Ballance* v. *Dunnington, supra.* There, however, was some testimony of defendant's negligence. This consisted of the expert's statement, the alleged admissions of the doctor, and other slight inferences from the testimony. We should not interfere with the verdict of the jury unless we are convinced that

it is against the great weight of testimony. Contrasted against plaintiff's testimony, consisting of an admission by the doctor, which is strenuously denied, and an expert whose qualifications are questioned, and some other minor circumstances from which inferences damaging to the defendant might be made, there is the testimony of defendant and other doctors of high professional standing in Grand Rapids showing that defendant was not guilty of any negligence. We are impressed with the fact that the testimony showed that plaintiff, when she first came to the doctor, not only had been but still was in a diseased condition. Notwithstanding the fact that part of her organs had been removed, she was still suffering from great pain and a vaginal discharge; she had arthritis which was caused by a focal infection, with indications that it might come from a raw and bleeding cervix. It was further shown that her condition was not cured at the University hospital; that defendant had good reason to believe that the cervix indicated the beginning of cancer and therefore it was necessary not only to remove the cervix but good surgery demanded that everything of a suspicious nature be also removed; that, as is claimed by defendant and there is no testimony to the contrary, the wall of the bladder was exceedingly thin; and that it broke or a fistula developed on account of its inherent weakness. It was further shown that the bladder wall when only slightly punctured frequently heals itself, but in this particular instance, it not only did not heal in this manner but did not even do so after it had been sutured numerous times. This would show that the bladder wall was diseased or thin and weak. The cervix, which was preserved for microscopical examination in the laboratory, showed that there was

no bladder wall tissue on it.   The report showed that it contained scar tissue.   There are many other factors in the case that impress us most strongly in favor of the defendant.   Defendant further testified that, while at first he believed that he had punctured the bladder wall, subsequent investigation proved that the bladder wall was weak and that plaintiff's paroxysms in recovering from the anesthetic and her subsequent vomiting, coughing, etc., for a protracted period, resulted in such a violent strain on the bladder wall as to cause the fistula or opening to develop.   Defendant claims that, if there was any fault on his part, it was in cutting away the scar tissue attached to and knitted into the wall of the bladder and then removing all diseased tissue to the extent only that his judgment and experience as a surgeon dictated.   There is testimony showing that at most defendant made a mistake in judgment.

It is difficult to weigh the exact *quantum* of evidence introduced by the respective parties with any degree of mathematical precision, and particularly so in a case of this nature.   While it may be claimed that the verdict was against the weight of the evidence, unless it clearly appears that it was against the great weight of evidence, the verdict of the jury should not be disturbed.   In this particular case we need not decide the question, for the case must be retried on account of ostensible error.

4.   Defendant claimed that if he was at all at fault it was on account of an honest mistake of judgment in a difficult situation which he was unable to foresee.   He testified that it became necessary to dissect very close to the bladder wall; that he exercised his judgment in determining through a sense of touch how far to cut when his knife encountered scar tissue which he could not see, and that it was wholly a matter of judgment in distinguishing be-

tween the cervix and the bladder wall, the thickness of which varies in individuals. His counsel requested the court to charge the jury as follows:

"I charge you further, that in determining the extent to which the outer wall of the bladder could be cut with safety in order that all of the cervix and the scar tissue attached to it should be removed, there is a certain realm in which the defendant was obliged to exercise and act in accordance with his best judgment, having in mind on the one hand the desirability of removing all of the tissue which it was suspected might be or become cancerous, and on the other hand the health and safety of the patient and the danger under the conditions observable at the time, of puncturing the walls of her bladder or of unduly weakening the same. If the defendant, being possessed of ordinary skill and knowledge, as I shall hereafter define those terms to you, and in the exercise of that ordinary skill, knowledge, and judgment so cut the wall of plaintiff's bladder, and afterwards the fistula developed spontaneously either by force of coughing, vomiting, or other extraordinary force or pressure not administered by the defendant, or if said fistula afterwards developed through some diseased or infected condition of the wall of plaintiff's bladder, there would be no liability upon the defendant, and if such should be found by you to be the fact, your verdict would be for the defendant."

While the charge of the judge was full and complete, it failed to charge the jury or make any allusion to the fact that a surgeon is not responsible for an honest error of judgment when he adopts a course of action in an emergency such as was claimed existed in this case. In *Luka* v. *Lowrie,* 171 Mich. 122 (41 L. R. A. [N. S.] 290), the court said:

"In an ordinary action for negligence, the fact that defendant has acted according to his best judg-

ment is no defense. His act is to be judged by the standard of conduct of an ordinarily prudent man under the circumstances. In conduct resting upon judgment, opinion, or theory, however, a different rule has been recognized. This distinction has been well pointed out in the case of *The Tom Lysle* (D. C.), 48 Fed. 690, where it is said:

> " 'The distinction between an error of judgment and negligence is not easily determined. It would seem, however, that if one, assuming a responsibility as an expert, possesses a knowledge of the facts and circumstances connected with the duty he is about to perform, and, bringing to bear all his professional experience and skill, weighs those facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out, then want of success, if due to such course of action, would be due to error of judgment, and not to negligence. But if he omits to inform himself as to the facts and circumstances, or does not possess the knowledge, experience, or skill which he professes, then a failure, if caused thereby, would be negligence.'  *  *  *

"It would be unreasonable to hold a properly qualified physician or surgeon responsible for an honest error of judgment, where, as in the instant case, he is called upon to act in an emergency and must choose between two courses of action either one of which involves the possibility of gravest hazard to the patient."

In *Delahunt* v. *Finton*, 244 Mich. 226, it was said:

"It is settled that a surgeon may lawfully perform, and it is his duty to perform, such operation as good surgery demands, in cases of emergency, without the consent of the patient.  *  *  *  In so doing he is not liable for an honest error of judgment."

The testimony showed that defendant claimed that he encountered an emergency when he found the diseased condition, scar tissue, etc., and he had to exercise his judgment in determining how deep

he should cut. it was not an operation like that of tonsillectomy or appendectomy, where a surgeon usually can see exactly the entire area around the diseased parts. Here he had to exercise his honest judgment and his best ability as to the extent of the operation. If he cut out the tissue in accordance with his best judgment based upon surgical skill and experience, and acted in good faith and to the best of his ability, lack of success would be due to error of judgment for which he would not be liable. It would not be negligence. The trial judge's attention was directed to the fact that he omitted to charge the jury in regard to the question of the exercise of a surgeon's judgment, but he failed to correct the error. This was fatal, for in a case as close as this one, the failure to properly charge the jury may have affected the verdict.

The judgment is reversed, with costs to defendant, and a new trial granted.

WIEST, CLARK, POTTER, SHARPE, NORTH, and FEAD, JJ., concurred. McDONALD, J., concurred in the result.