## LeBLANC v LENTINI

1. PHYSICIANS AND SURGEONS—MALPRACTICE—SPECIALISTS—GENERAL
   PRACTITIONERS—STANDARD OF CARE—STATUTES.

   Two separate common law standards are applied in evaluating
   medical care in a malpractice action; specialists are held to the
   degree of skill and knowledge possessed by physicians who are
   specialists in the light of present day scientific knowledge with
   no geographical limitations, while general practitioners are
   held to the standards of professional competence of general
   practitioners existing in their local community or in similar
   communities in light of the state of the art.

2. PHYSICIANS AND SURGEONS—SPECIALISTS—GENERAL SURGEONS—
   STANDARD OF CARE—PROFESSIONAL COMPETENCE—WITNESSES—
   EXPERT TESTIMONY.

   A "general surgeon" is not a specialist and does not fall within
   the category which must be judged by the standard of special-
   ists in specific areas of the practice of medicine; rather, his
   liability must be determined on the basis of any deviation from
   the standard of professional competence, and the exercise
   thereof, in his community or communities sufficiently similar
   thereto to constitute a proper basis for the expression of quali-
   fied expert opinion testimony as to that standard.

3. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE—
   EXPERT TESTIMONY—ADMISSIBILITY—JUDGE'S DISCRETION—CRED-
   IBILITY—JURY QUESTION.

   A specialist, in a malpractice action, may testify as to the

---

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 110,
111, 116, 119.

Malpractice testimony: competency of physician or surgeon from
one locality to testify, in malpractice case, as to standard of care
required of defendant practicing in another locality. 37 ALR3d
420.

[3] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 199–
201, 205–207.

[4, 5] 75 Am Jur 2d, Trial §§ 193, 194.

[6] 41 Am Jur 2d, Husband and Wife § 451.

61 Am Jur 2d, Physicians, Surgeons and Other Healers § 216.

standard of care of a general practitioner as long as the witness is knowledgeable about the general practitioner's standard of care; the qualifications of a surgeon testifying as an expert may be based upon the fact that he was a man of experience who had performed similar operations which were not very unusual and who had heard defendant's testimony as to the practice of surgery in that locality even though he was not from the same area; however, the admissibility of such testimony is within the discretion of the trial court and, if admitted, the credence to be given such testimony is for a jury to determine.

4. Appeal and Error—Mistrial—Prejudicial Questions—Cure of Prejudice—Judge's Discretion—Miscarriage of Justice.

A trial court's denial of a defendant's motion for mistrial based upon unanswered improper and prejudicial questions will not be disturbed by the Court of Appeals where prompt and forceful action by the trial judge cured the prejudice and there was no miscarriage of justice.

5. Witnesses—Proper Questions—Cross-Examination—Judge's Discretion—Trial—Mistrial—New Trial.

A trial court's refusal to declare a mistrial or to grant a new trial on the basis of an alleged improper question was not an abuse of discretion where counsel had a reasonable basis for asking the question which was proper cross-examination attempting to show the bias of an expert witness.

6. Divorce—California Law—Judgment Nunc Pro Tunc—Retroactive Divorce—Validation of Marriage—Damages—Marital Consortium—Prejudice.

A *nunc pro tunc* divorce judgment, retroactive to a date when a final divorce judgment could have been obtained but was not may be entered in California for the purpose of validating a subsequent marriage; a validation of a marriage entered into before a divorce was final by means of a California *nunc pro tunc* divorce judgment is a basis to support a claim for damage to marital consortium, in a new Michigan marriage, arising from malpractice where there has been no showing that the defendant would be unfairly prejudiced thereby.

Appeal from Cheboygan, Philip J. Glennie, J. Submitted December 6, 1977, at Grand Rapids. (Docket No. 28449.) Decided March 20, 1978. Leave to appeal applied for.

Complaint by Samuel LeBlanc and Beverly Le-

Blanc against Nicholas Lentini, M.D., for damages for medical malpractice. Judgment for plaintiffs. Defendant appeals. Affirmed.

*Richard H. Scholl,* for plaintiffs.

*Clark, Stroup, Brown, MacKenzie & Pointner,* for defendant.

Before: DANHOF, C. J., and T. M. BURNS and M. J. KELLY, JJ.

DANHOF, C. J. Plaintiffs filed suit in circuit court on August 16, 1973, alleging medical malpractice by the defendant, and others, in connection with surgeries performed by the defendant on plaintiff Samuel LeBlanc on January 22, 1973, and January 25, 1973, in a hospital in Cheboygan, Michigan.

On December 18, 1975, a jury returned verdicts in favor of both plaintiffs, Samuel LeBlanc was awarded $225,000 and Beverly LeBlanc was awarded $25,000. Judgment was subsequently entered on these verdicts. Defendant's motions for judgment notwithstanding the verdict and for relief from judgment, or in the alternative, for a new trial were denied by the circuit court. Defendant appeals as of right.

Plaintiffs' third amended complaint filed June 12, 1975, alleged that Samuel LeBlanc had consulted with Dr. Lentini in January of 1973 because of digestive system disorders and as a result, Dr. Lentini had had Mr. LeBlanc admitted to a hospital on January 9, 1973. The complaint further alleged that Dr. Lentini diagnosed plaintiff's condition as esophageal hiatus hernia and duodenal ulcer and, essentially, that defendant committed medical malpractice by performing unnecessary

surgery on January 22, 1973, when conservative medical treatment was the only treatment indicated for Mr. LeBlanc's condition; by performing the January 22, 1973, surgery without plaintiffs' *informed* consent; by negligently leaving an 18″ × 18″ surgical sponge inside Mr. LeBlanc at the conclusion of the January 22, 1973, surgery; and by failing to properly close the surgical wound at the conclusion of a second surgery performed on January 25, 1973, to remove the sponge. The complaint further alleged various resulting injuries and damages suffered by Mr. LeBlanc including permanent weakening of the incisional area resulting in several incisional herniae requiring still further surgeries for correction, and loss of consortium by Beverly LeBlanc.

Defendant raises eight issues on appeal. We affirm.

# I

Defendant states his first issue as follows:

*"Was the testimony of plaintiffs' expert witness, Dr. George W. Miller, properly admitted against defendant Lentini, a general practitioner, even though Dr. Miller was admittedly unfamiliar with the medical standards of the Cheboygan community, and improperly based his testimony on a supposed national standard of care applicable to all general practitioners? No."*

This issue involves two separate questions: The proper standard of care to be applied in this case, and the competency of Dr. Miller to testify as to the applicable standard of care. In general, in Michigan there are two separate standards applied in evaluating medical care in a malpractice action. Specialists are held to the degree of skill and

knowledge possessed by physicians who are specialists in the light of present day scientific knowledge with no geographical limitations, while general practitioners are held to the standard of professional competence of general practitioners existing in their local community or in similar communities in light of the state of the art.[1]

The plaintiffs argued in the trial court that defendant Dr. Lentini was a specialist subject to a national standard of care because he had held himself out as a surgeon. In effect, the plaintiffs equated surgeon with specialist. The trial court ruled that the standard of practice applicable to Dr. Lentini "is one of locality, * * * governed by the standard of practice in Cheboygan and of similar communities". In an attempt to justify the admission of Dr. Miller's testimony, plaintiffs have reiterated to this Court their argument that Dr.

---

[1] In his "to concur" opinion in *Siirila v Barrios,* 398 Mich 576, 634; 248 NW2d 171 (1976), Justice WILLIAMS argued for a modified rule and concluded:

"We would hold that the test in Michigan henceforth shall be that a general practitioner is under duty to use that degree of care and skill which is expected of a reasonably competent practitioner of the same class, acting under the same or similar circumstances, having in mind (a) the state of the art for the particular medical situation, (b) whether a specialist should reasonably have been consulted and (c) such local factors as might be pertinent."

Subsequently, however, in enacting MCLA 600.2912(a); MSA 27A.2912(1), the Legislature has established the following:

"In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

"(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

"(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury."

Lentini was a surgeon or held himself out to be a surgeon and was therefore to be judged as a surgeon. *Wood v Vroman,* 215 Mich 449, 465–466; 184 NW 520 (1921). Consequently, argue plaintiffs, Dr. Lentini was a specialist subject to a "national" standard of care under the holding of *Naccarato v Grob,* 384 Mich 248, 253–254; 180 NW2d 788 (1970), which reads in part:

"The reliance of the public upon the skills of a specialist and the wealth and sources of his knowledge are not limited to the geographic area in which he practices. Rather his knowledge is a speciality. He specializes so that he may keep abreast. Any other standard for a specialist would negate the fundamental expectations and purpose of a speciality. The standard of care for a specialist should be that of a reasonable specialist practicing medicine in the light of present day scientific knowledge. Therefore, geographical conditions or circumstances control neither the standard of a specialist's care nor the competence of an expert's testimony."

Dr. Lentini testified that he was both a physician and a surgeon practicing in the Cheboygan, Michigan, area and was a fellow of the International College of Surgery. Dr. Lentini further testified that he designated himself as a physician and a surgeon, an M.D. and F.I.C.S. He further testified that he was not "board certified" as a surgeon and not a member of the American College of Surgeons, that he did have extensive surgical privileges at the local hospital and that most of the surgeries he performed were on patients generated within his own general practice. This testimony shows that the trial court applied the correct standard of care in this case. The defendant was not a specialist. Defendant was a general practitioner who performed a large number of difficult

surgeries. He had not specialized as a surgeon, nor as a practitioner of any particular type of surgery. In *Abbe v Woman's Hospital Association,* 35 Mich App 429, 433–434; 192 NW2d 691 (1971), this Court found that a "general surgeon" was not a specialist and that

"He does not fall within the category which must be judged by the standard of specialists in specific areas of the practice of medicine. Rather, his liability must be determined on the basis of any deviation from the standard of professional competence, and the exercise thereof, in his community or communities sufficiently similar thereto to constitute a proper basis for the expression of qualified expert opinion testimony as to that standard."

The defendant in the instant case was both a general practitioner and a surgeon. The plaintiff failed to demonstrate that the defendant was a specialist in a specific area of medical practice. Therefore, the holding of *Naccarato v Grob, supra,* does not apply here.

The "locality" rule has been variously stated by Michigan courts. In *Miller v Toles,* 183 Mich 252, 257; 150 NW 118 (1914), the Court stated:

"In treating a broken or diseased limb, the implied contract between the surgeon and patient is not to restore it to its natural condition, but to use that degree of diligence and skill which is ordinarily possessed by the average of the members of the profession in similar localities, giving due consideration to the state of the art at the time. 30 Cyc. p. 1573, n. 35; 39 Cent. Dig. title 'Physicians and Surgeons,' § 23."

In *Morgan v Engles,* 13 Mich App 656, 661; 164 NW2d 702 (1968), this Court stated:

"In a negligence action, a qualified medical practitioner should be subject to liability if he fails to exercise an established standard of care and skill. The standard is not determined by the particular physician's actual or constructive knowledge of treatments, but rather by the customary practice in the local medical community and an area coextensive with the medical and professional means available in centers readily accessible for appropriate treatment of the patient."

In *Lince v Monson,* 363 Mich 135, 140–141; 108 NW2d 845 (1961), the Court also pointed out the necessity for expert testimony in order to establish most[2] medical malpractice claims:

"In a case involving professional service the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice in the community. For that, the aid of expert testimony from those learned in the profession involved is required. As this Court said in *Zoterell v. Repp,* 187 Mich 319, 330 [153 NW 692 (1915)]:

" 'As to those matters of special knowledge strictly involving professional skill and attention, unskillfulness, negligence, or failure to do that which ought to be done must be shown by the testimony of those learned in such matters.'

" 'In conduct, like that of a surgeon, resting upon judgment, opinion, or theory, the ordinary rules for determining negligence do not prevail. *Luka v. Lowrie,* 171 Mich 122 [136 NW 1106 (1912)] (41 LRA NS 290); *The Tom Lysle* (WD Pa), 48 F 690; *Brown v. French,* 104 Pa 604; *Williams v. LeBar,* 141 Pa 149 (21 A 525).

[2] The parties apparently agree that an exception to this general rule existed as to the sponge issue and that the jury in the instant case could have considered, even absent expert testimony, whether the defendant was negligent in leaving the surgical sponge in the body of the plaintiff for several days. *See LeFaive v Asselin,* 262 Mich 443; 247 NW 911 (1933), and *Winchester v Chabut,* 321 Mich 114, 119; 32 NW2d 358 (1948).

One reason for the rule is that when one acts according to his best judgment in an emergency, he is not chargeable with negligence. *Luka v. Lowrie, supra; Staloch v. Holm,* 100 Minn 276 (111 NW 264, 9 LRA NS 712); *Williams v. Poppleton,* 3 Or 139; 30 Cyc, p 1587; *Sherwood v. Babcock,* 208 Mich 536 [175 NW 470 (1919)].

" 'In order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or surgeon did was contrary to the practice *in that or similar communities,* or that he omitted to do something which was ordinarily done *in that or similar communities.' Delahunt v. Finton,* 244 Mich 226, 229, 230 [221 NW 168 (1928)]."

See also *Perri v Tassie,* 293 Mich 464, 469–471; 292 NW 370 (1940).

Several Michigan cases have dealt with the test to be used in determining the competency of an expert medical witness to testify as to the applicable standard of care. *Sampson v Veenboer,* 252 Mich 660, 666–667; 234 NW 170 (1931), reads in part:

"It is claimed that Dr. Thexton did not have the qualifications of an expert, and that his testimony should have been excluded. He was permitted to testify as to the practice of surgery in Grand Rapids and similar communities in western Michigan.

\* \* \*

"He never visited the hospitals or practiced medicine or surgery in the State of Michigan.

\* \* \*

"The fact that he was a man of experience and had performed somewhat similar operations, even though not the identical one in question, and the further fact that it was not shown that this was a very unusual operation, and the further knowledge that he obtained in the court-room listening to defendant's testimony in regard to the practice of surgery in Grand Rapids, were

sufficient to qualify him as an expert. The jury was sufficiently informed so as to be able to judge the extent of his qualifications and to decide how much credence should be given to the testimony. At times it may become necessary to secure the expert testimony of one who resides some distance from the home of a defendant accused of malpractice, for it may be difficult to obtain a witness to testify against one who bears the very high professional reputation of defendant. If it would always be necessary to secure an expert from the vicinity of the home of a defendant who might be the only practitioner there, it would be impossible to secure such testimony at all. What credence should be given to the expert's statements is another matter. That was the province of the jury."

In *Siirila v Barrios,* 398 Mich 576, 597; 248 NW2d 171 (1976), the Court concluded that:

"[A] specialist may testify as to the standard of care of a general practitioner as long as the witness is knowledgeable about the general practitioner's standard of care."

More recently, in *Callahan v William Beaumont Hospital,* 400 Mich 177, 180; 254 NW2d 31 (1977), in discussing the standard for determining the competence of a witness to testify as to the local standard of care, the Court stated:

"The question is not whether the proffered expert witness ever practiced in the same geographical area in which the defendant practiced or in a similar area. Rather, the determinative question is whether the proposed expert witness knew what the practice was."

Pertinent excerpts from the testimony of the plaintiffs' expert witness, Dr. Miller, include:

"A. I am familiar with the standard of care for

duodenal ulcer in the entire United States, which would include, I believe, Cheboygan.

\* \* \*

"Q. Now, your testimony regarding the treatment of this disease, do you know whether this, or what the standard of practice is in a medical community including Cheboygan, Michigan, with regard to your testimony—

"MR. STROUP: Again, for the benefit of the record, your Honor, I have an objection. I understand the Court previously ruled against me on that point, but I want the record to reflect—

"THE COURT: First of all, let us see whether the answer to the question, first of all, is yes or no. That will determine the objection.

"A. The standard of practice—I'm sorry—

"THE COURT: Do you know the standard of practice?

"A. The answer is yes, sir.

"THE COURT: Objection is overruled. He may answer.

"Q. *[sic]* The standard practice for hiatus hernia is well known throughout this country, as was indicated yesterday in preliminary examination, or whatever the term is. We are not living in the days where people in Cheboygan should get less care than the people who are living in Manhattan.

"Q. (By Mr. Scholl, continuing) All right.

"A. And that the transmission of medical knowledge is so broad and diffuse that there is a national standard of care.

"Q. With respect to the treatment—

"A. Of hiatus hernia.

\* \* \*

"Q. Dr. Miller, do you have an opinion whether or not Dr. Lentini's performance of surgery on 1/22/73 for hiatal hernia and duodenal ulcer on Mr. LeBlanc constituted a deviation from the standard of practice for the City of Cheboygan?

"MR. STROUP: I object, your Honor, on the grounds which the Court previously ruled on as to this witness'[s] competency to pass upon the standard of care in Che-

boygan. Further, I think the question is overly broad and calls for a conclusion of the witness and invades the province of the jury.

"THE COURT: I'll permit the doctor to answer. Objection overruled.

"Q. (By Mr. Scholl, continuing) You may answer the question, Doctor. Do you have an opinion?

"A. I do, sir.

"Q. And what is your opinion?

"A. My opinion is that this disease is so common throughout the entire United States, the bed of knowledge is so well proven, and the indications for surgical intervention are so well recognized, there are absolutely —or unfortunately, I can find no indications for surgery being performed on Mr. LeBlanc.

"Q. So my question to you once again then is, did the performance of surgery by Dr. Lentini on January 22, 1973, doing surgery on a hiatus hernia and duodenal ulcer, violate the standard of practice as it should be practiced in the City of Cheboygan?

"A. It is my best medical opinion that it did, sir.

\* \* \*

"Q. (By Mr. Scholl, continuing) Doctor, do you know what the standard of practice is among general practitioners or surgeons who may engage in surgery, in a community of the size of Cheboygan, or of Cheboygan, or community of similar size in the State of Michigan, concerning the question of informed consent?

"A. Yes, I believe I do, sir.

\* \* \*

"Q. Doctor, do you have an opinion as to whether or not though, after the search that I've indicated to you previously that was made for the sponge, whether it was consistent with good surgical practice—standard of good surgical practice in a community such as Cheboygan, to sew the patient up when the sponge was unaccounted for, and the patient's vital signs were not alarming insofar as this patient's well being was concerned?

"A. I think it's a large deviation from the standard of

practice to close a patient up when there is a deviation of the sponge count."

Defendant argues that the trial court, by allowing Dr. Miller's testimony to get to the jury, extended the national standard of care to general practitioners thereby committing clear error. We disagree. The trial court correctly ruled that the locality standard applied but that in some cases, local standards might be uniform throughout the United States:

" 'THE COURT: Well, the Court is prepared to rule. I'm going to rule, of course, that the test is one of locality, that the standard of practice insofar as Dr. Lentini is concerned is governed by the standard of practice in Cheboygan and of similar communities. However, there are certain areas in connection with medicine that are so well known that I think that any expert could testify as to that standard of practice, and so I think what we'll do, I'll permit you to go forward with your questioning and subject, of course, to any further objection, but as I state, there are areas of medicine so well known and taught, and they are commonplace in every locality, every community both large and small in the entire United States, *and if this is one of those situations,* then of course, I will permit the doctor to testify.'

\* \* \*

" 'THE COURT: Let me decide it as far as this case is concerned. As I state, at this point, the standard of practice is the practice within the area of Cheboygan and other similar communities of like size, and so on. That will be the standard. It's been stated so many times by the Michigan Supreme Court.' " (Emphasis added.)

While the burden was on the plaintiffs to establish that their expert, Dr. Miller, knew the applicable standard of care, the admissibility of Dr.

Miller's testimony was a matter within the discretion of the trial court. *Siirila v Barrios, supra,* at 591. Our careful review of the extensive record in this case convinces us that the trial court did not abuse its discretion in admitting the testimony of Dr. Miller.

Dr. Miller's testimony included the following: That he had been present throughout the testimony given by the defendant, Dr. Lentini, when the defendant was called as plaintiffs' first witness; (This testimony by Dr. Lentini dealt with his treatment of Samuel LeBlanc and generally with his practice in Cheboygan including defendant's assertions that he was a general practitioner who had performed hundreds of surgical operations of the same magnitude as the ones performed on Samuel LeBlanc, and that he spent approximately two weeks per year attending post graduate courses in various parts of the United States); he, Dr. Miller, received his M.D. degree in Massachusetts in 1951, spent four years in surgical residency there, he thereafter practiced (primarily surgery with 20% to 30% general practice) in Norway, Maine and South Paris, Maine, for a three-year period (1957–1960) at a community hospital, that these communities were of a size which we note is similar to that of Cheboygan[3]; that he became board certified in general surgery while practicing in Norway and has since regarded himself as a surgical specialist; that he became a fellow of the American Cancer Society and practiced extensive heroic cancer surgery for two years at the Sloan-Kettering Institute in New York; that he then came to Detroit, Michigan, to work in

---

[3] Dr. Miller testified that "Norway, and South Paris, * * * are communities of about five to eight thousand". In defendant's brief the 1970 population of the City of Cheboygan is given as 5,533.

industrial medicine and did consultant work for Blue Shield; that since 1965, when he underwent an unsuccessful back operation, he has not practiced surgery, but since 1967, he has engaged in general practice, devoting a substantial portion of his time to legal matters including giving expert testimony, currently practicing in St. Clair Shores, Michigan, and Grosse Pointe Farms, Michigan; that he was familiar with the applicable standard of practice in those cities; that he was familiar with the standards of practice for general practitioners with respect to the diagnosis and treatment of duodenal ulcers and hiatal hernias in Norway, Maine, at the time of his practice there and that the general standard of treatment for duodenal ulcers had not changed significantly since that time and that the known causes and basic treatment of the two conditions had remained unchanged from the time he practiced in Norway, Maine, and that the standard of practice in treating duodenal ulcers is the same throughout the United States; that he has treated duodenal ulcer and hiatus hernia patients in his own practice; and that duodenal ulcer and hiatal hernia "is one of the most popular subjects that are discussed, because it is one of the most frequent and common recurring symptoms in our society".

Considering the background of the witness and the nature of the medical conditions involved, we believe that Dr. Miller was sufficiently qualified to testify as an expert on the applicable standard of care in Cheboygan or similar communities at the time in question, even though he had never treated a patient in Cheboygan and was generally unfamiliar with the area. How much credit to give to his testimony was for the jury to decide. *Sampson v Veenboer, supra.*

## II

Defendant also contends that the trial court erred "in refusing to grant defendant's motion for mistrial regarding improper cross-examination by plaintiffs' counsel questioning defendant as to why his attorney made an objection".

Defendant testified in his own behalf during the trial. While cross-examining the defendant, plaintiffs' counsel asked the defendant why defense counsel had objected to certain questions asked of other witnesses. Defense counsel objected and moved for a mistrial. The objection was sustained, the mistrial denied and the jury was instructed that defense counsel "is not the agent of defendant in this case" and that arguments, statements and remarks of attorneys are not evidence. Plaintiffs' counsel then asked the same question again in slightly altered form. The trial court ordered the question stricken from the record and directed plaintiffs' counsel not to pursue it any further. The questions went unanswered. Assuming *arguendo* that the questions themselves were improper and prejudicial, we believe that the prompt and forceful action of the trial court cured the prejudice and that no miscarriage of justice resulted from the trial court's exercise of discretion in denying the mistrial. Therefore, we will not disturb that ruling. *Kucken v Hygrade Food Products Corp,* 51 Mich App 471, 473; 215 NW2d 772 (1974).

## III

Defendant also contends that the trial court erred in refusing to declare a mistrial after plaintiffs' counsel, while cross-examining, asked one of defendant's expert witnesses, Dr. Rankin, the following question:

"Q. Under your oath, did you make a remark yesterday out here in the door to Mrs. MacKenzie, like this, 'Don't worry about it. We'll shove it to him'?"

Dr. Rankin's answer and subsequent testimony were:

"A. I don't recall that.
"Q. You don't recall that, sir?
"A. No.
"Q. Are you saying that you did not make that remark?
"A. I didn't say that. I said I do not recall that.
"Q. Is that why you are so evasive to this question, Doctor?
"A. I am not being evasive. I am only trying to answer what's on the record.
"THE COURT: The jury will step out a moment."

After the jury was excused, Dr. Rankin testified that he had not made the statement. Mrs. Mac-Kenzie, defense counsel, also testified out of the presence of the jury that she did not recall such a statement having been made. With the jury still excused, Linda Gilbo, a friend of the plaintiffs and a spectator at the trial, testified that she had overheard the remark being made by Dr. Rankin to Mrs. MacKenzie on the previous day and had informed plaintiffs' counsel that the statement had been made.

Defense counsel asked for a mistrial, which was not granted. No cautionary instruction was requested and none was given. Defendant cites *Sullivan v Deiter,* 86 Mich 404; 49 NW 261 (1891), and *People v Rice,* 136 Mich 619; 99 NW 860 (1904), to support his contention that the question put to Dr. Rankin was improper. Both of these cases are clearly distinguishable. The record in the instant

case shows that plaintiffs' counsel had a reasonable basis for asking the question which was proper cross-examination attempting to show the bias of the witness. *Hayes v Coleman,* 338 Mich 371, 380–381; 61 NW2d 634 (1953). See also *Snyder v Mathison,* 196 Mich 378, 387; 163 NW 104 (1917). Since the question was not improper, no error was committed in refusing to declare a mistrial. The trial court's refusal to grant a new trial based on its finding of lack of error was also a proper exercise of its discretion. See *Willett v Ford Motor Co,* 400 Mich 65, 70–71; 253 NW2d 111 (1977).

IV

Defendant also argues that the judgment in favor of Beverly LeBlanc "for damage to the marital consortium is unsupportable in fact and fraudulently procured and accordingly ought to be set aside". The plaintiffs, Samuel and Beverly LeBlanc, consistently maintained prior to and during trial that they were married to each other. Samuel LeBlanc had been previously married, he and his first wife were granted an interlocutory judgment of divorce in California on September 8, 1965. However, the final judgment of divorce was not granted until February 2, 1967. Plaintiffs were married to each other in Detroit, Michigan, on December 17, 1966. Defendant argues that Samuel LeBlanc was under a legal disability to contract the second marriage due to his prior subsisting marriage to his first wife and that therefore the second marriage was a nullity. MCLA 552.1; MSA 25.81.

On March 19, 1976, upon application by Samuel LeBlanc to the Orange County California Superior Court, the February 2, 1967, divorce order was set aside and a final judgment of divorce *nunc pro*

*tunc* to May 2, 1966, was granted. Plaintiffs argue that this *nunc pro tunc* order validated the second marriage. In ruling on this issue the circuit court stated:

"Upon review of the testimony and the matters alleged, this Court is of the opinion that Samuel LeBlanc did not commit fraud on the Court. He was served with a copy of the Interlocutory Judgment and may well have believed that such divorce was final. In any event, Samuel LeBlanc's former wife did not secure the final Judgment until many months after the time when such Judgment could have been entered by the Court in Orange County, California. Since the trial of this cause, such Judgment has been finalized nunc pro tunc, a procedure which is recognized in the State of California and by this Court."

California law provides for granting such *nunc pro tunc* judgments retroactively to a date when a final divorce judgment could have been, but was not, obtained for the purpose, among others, of validating subsequent marriages. Validation of the marriage between the plaintiffs, effective from the original date of that marriage, is within the scope of the California law. *Armstrong v Armstrong,* 85 Cal App 2d 482; 193 P2d 495 (1948). See also *Waller v Waller,* 3 Cal App 3d 456; 83 Cal Rptr 533 (1970), and *In re Marriage of Frapwell,* 53 Cal App 3d 479; 125 Cal Rptr 878 (1975), for additional discussion of the California law.

Defendant argues that the *nunc pro tunc* order cannot "retroactively validate the fraudulent judgment entered in favor of Beverly LeBlanc in the instant case". We agree that the retroactive validation of the marriage does not necessarily affect the rights of the defendant acquired prior to March 19, 1976. However, absent any showing that the defendant would be unfairly prejudiced

thereby, we hold that the retroactive validation of the plaintiffs' marriage provides a sufficient basis for the judgment in question.

## V

Defendant's other allegations of error either present issues not properly preserved for appellate review or are without merit.

Affirmed. Costs to plaintiffs.