HIGGINS v DETROIT OSTEOPATHIC HOSPITAL CORPORATION

Docket No. 82569. Submitted April 1, 1986, at Detroit. Decided September 16, 1986. Leave to appeal applied for.

Lynda Higgins, individually and as next friend of Jamie Lynn Higgins, brought a medical malpractice action in Wayne Circuit Court against Detroit Osteopathic Hospital Corporation and several osteopathic physicians for injuries allegedly suffered by Jamie Higgins at the time of her birth and shortly thereafter. At trial, the plaintiff attempted to have three different doctors of medicine qualified as expert witnesses to testify as to the applicable standard of care. While each of these doctors of medicine indicated that he was familiar with the standard of care applicable to a doctor of osteopathic medicine under the circumstances on the basis of contacts with osteopathic physicians, the trial court, Maureen Pulte Reilly, J., found that these doctors of medicine were not qualified to testify as to the standard of care applicable to doctors of osteopathic medicine. There being no expert testimony as to the applicable standard of care, directed verdicts were entered in favor of defendants. A directed verdict was also entered on the basis of the Good Samaritan statute in favor of the pediatrician who was called in because the baby was not breathing and would die if she did not receive immediate medical attention. Plaintiff appealed.

The Court of Appeals held:

1. It was error for the trial court to refuse to permit the doctors of medicine to testify as to the applicable standard of care by a doctor of osteopathic medicine, since it was clearly established that each of the witnesses was familiar with the

REFERENCES

Am Jur 2d, Expert and Opinion Evidence §§ 8 et seq.

Am Jur 2d, Negligence §§ 94 et seq.

Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 302 et seq.

Construction of "good Samaritan" statute excusing from civil liability one rendering care in emergency. 39 ALR3d 222.

Competency of general practitioner to testify as expert witness in action against specialist for medical malpractice. 31 ALR3d 1163.

See also the annotations in the Index to Annotations under Intentional, Wilful, and Wanton Acts.

applicable standard of care through his contact with osteopathic physicians. The fact that the witnesses were of a different school of medicine than the defendants did not disqualify them from being expert witnesses and testifying as to the standard of care, if they, as they did, had knowledge of that standard of care.

2. The trial court properly determined that there existed a "life threatening emergency" within the meaning of the Good Samaritan statute. Since there was no prior doctor-patient relationship and the plaintiff's proofs failed to establish anything more than ordinary negligence, the directed verdict was properly granted in favor of the pediatrician on the basis of the Good Samaritan statute.

Affirmed in part, reversed in part, and remanded.

1. Witnesses — Expert Witnesses — Court Rules.

A witness may be qualified as an expert by knowledge, skill, experience, training or education and, in the case of a medical witness, medical training, experience, and continuing review of literature may be sufficient to qualify a person as an expert witness (MRE 702).

2. Witnesses — Expert Witnesses — Medical Malpractice.

A member of one medical school of thought may testify as to the standard of care applicable to members of another school of thought if the witness is familiar with the applicable standard of care; a specialist may testify as to the standard of care of a general practitioner.

3. Witnesses — Expert Witnesses — Medical Malpractice.

A physician who testifies as an expert witness in a medical malpractice case may base his knowledge of the applicable standard of care upon hearsay information from contact with other physicians.

4. Physicians and Surgeons — Emergency Care — Negligence — Gross Negligence — Good Samaritan Act.

A physician who is not required by his hospital duty to respond to an emergency situation but who, in good faith, responds to a life-threatening emergency within a hospital, by statute, is not liable for any civil damages as a result of any act or omission in the rendering of the emergency care except where the omission amounted to gross negligence or wilful and wanton misconduct, provided that no physician-patient relationship existed prior to the emergency situation (MCL 691.1502; MSA 14.563[12]).

5. Negligence — Wilful and Wanton Misconduct.
    Wilful and wanton misconduct is distinguished from ordinary
    negligence by an intent to harm or by an indifference of a
    defendant in the presence of the probability of harm which is
    tantamount to a willingness that the harm occur.

*Charfoos, Christensen & Archer, P.C.* (by *Dennis W. Archer* and *J. Douglas Peters*), for plaintiff.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Charles W. Fisher* and *Susan Healy Zitterman*), for Rich A. Poston, D.O.

*Dice, Sweeney, Sullivan, Feikens, Hurbis & Foster, P.C.* (by *Dennis J. Mendis* and *Dale Herbert*), for Detroit Osteopathic Hospital and Raymond W. Dieter, D.O.

*MacArthur, Cheatham, Acker & Smith, P.C.* (by *Charles C. Cheatham* and *James G. Gross*), for David L. Wolf, D.O. and Harvey C. Orth, D.O.

Before: Cynar, P.J., and Wahls and E. E. Borradaile,* JJ.

Per Curiam. This appeal is the result of directed verdicts for defendants in this medical malpractice suit. Two issues are raised. One deals with the court's determination of whether a witness is competent to testify as an expert. The other concerns the protections of the "Good Samaritan" act when an outside doctor is contacted by a hospital on behalf of a patient.

The facts center around the birth and first few hours of Jamie Lynn Higgins' life, and can be stated briefly for purposes of this appeal. After birth at defendant Riverside Osteopathic Hospital, the delivery doctors, defendants David Wolf, D.O.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and Raymond Dieter, D.O., noted that the newborn was having difficulties. Dr. Wolf requested the hospital contact defendant Rick Poston, D.O., a pediatrician. Following a telephone call at his home, Dr. Poston rushed over to the hospital and conducted a series of tests before having Jamie Lynn transferred to another hospital that specialized in neonatal care.

Plaintiff sued all involved for medical malpractice. The trial court granted directed verdicts for defendants. Plaintiff appeals.

The first issue relates to expert testimony. At trial, plaintiff offered several doctors as expert witnesses. The trial court refused to allow these doctors to testify as to the osteopathic standard of care. Plaintiff argues that this refusal was error. We agree.

The general rule is found in MRE 702 which provides:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This Court in *Haisenlenden v Reeder,* 114 Mich App 258, 264-265; 318 NW2d 634 (1982), lv den 417 Mich 969 (1983), stated the general rule and applied it to a case very similar to the present one:

> In the present case, the court concluded that Dr. Baublis could not base his knowledge of the applicable standard of care upon hearsay information from contact with other physicians. This conclusion was erroneous.
>
> A witness may be qualified as an expert "by

knowledge, skill, experience, training, or education". MRE 702. *Siirila v Barrios*, 398 Mich 576, 591; 248 NW2d 171 (1976). Medical training, experience and continuing review of literature may be sufficient, *Croda v Sarnacki*, 106 Mich App 51, 60; 307 NW2d 728 (1981).

A member of one medical school of thought may testify as to the standard of care applicable to members of another school of thought if the witness is familiar with the applicable standards of care, *Siirila, supra,* 591. A specialist may testify as to the standard of care for a general practitioner. As stated in *Siirila:*

"The rule therefore as to the ability of a specialist testifying as to a general practitioner's compliance with the requisite standard of care of a general practitioner is only that the witness have knowledge of the standard of care about which he or she is testifying. The standard of care discussed must of course be that of a general practitioner. . . . The weight to be given such testimony is, of course, a matter for the jury." Siirila, supra, 593.

Finally, the geographical area of practice is not determinative; only whether the proposed expert knew what the practice was. *Callahan v William Beaumont Hospital,* 400 Mich 177; 254 NW2d 31 (1977). See also *LeBlanc v Lentini,* 82 Mich App 5; 266 NW2d 643 (1978).

Applying these rules to the present case leads us to conclude that the trial court erred in refusing the testimony of the proffered witness. Unlike the proposed expert witnesses in *Siirila, supra,* and *Callahan, supra,* Dr. Baublis testified that he knew the standard of care for an emergency room physician. He also stated that the standard would apply to an osteopathic physician. The foundation for Dr. Baublis's knowledge was his experience in emergency rooms, although several years ago, and frequent contact with emergency room osteopathic physicians requesting consultation. Merely because Dr. Baublis was a specialist and not a "troop in the trench" does not render him unqualified as

long as he knows the applicable standard of care. The weight of his opinion is for the jury to decide.

In the instant case, plaintiff's counsel offered Edgar Beaumont, M.D., Lee B. Stevenson, M.D., and Charles Vincent, M.D. as expert witnesses. Dr. Beaumont testified that he was board certified in pediatrics and neonatal-perinatal medicine (the care of infants during their first twenty-eight days of life). For the last 2½ to 3 years Dr. Beaumont had worked with osteopathic pediatricians on staff at Butterworth Hospital in Grand Rapids. Dr. Beaumont had discussed management of critically ill newborns with these osteopathic pediatricians. Further, during Dr. Beaumont's residency at the University of Chicago he had treated patients who had been referred by osteopathic pediatricians. During treatment of these patients he had had phone conversations or discussions regarding the patients' management with the referring doctors. Dr. Beaumont testified that he knew the osteopathic pediatric standard of care for critically ill newborns as of the date of Jamie Lynn's birth based upon his clinical experiences while at the University of Chicago, University of Michigan, and Butterworth Hospital. Dr. Beaumont noted that the standard had changed between 1980 and 1984 but that the standard of care was always the same for both allopathic and osteopathic pediatricians.

The lower court found this testimony insufficient. It concluded that Dr. Beaumont could not base his knowledge of the applicable standard of care upon hearsay information from contact with other physicians. The court required Dr. Beaumont to recall specific instances of treatment of infants referred by osteopathic pediatricians during his residency at the University of Chicago. Dr. Beaumont, however, was unable, in certain instances,

to remember treating more than three infants referred from osteopathic pediatricians with certain medical problems. At the conclusion of this testimony, the court refused to allow Dr. Beaumont to testify as to the standard of care with respect to the management of blood gases, prescription of Dopamine, breathing problems, flacidity in the lower extremities of infants, or lumbar punctures where an infant had suffered a transected spinal cord: all relevant in this case. The court, however, did allow Dr. Beaumont to testify as to the standard of care with respect to x-rays and lumbar punctures used to uncover problems with sepsis and subarachnoic bleeding problems.

Charles Vincent, M.D., testified that he had been board certified in obstetrics and gynecology since 1965. From 1977 he had been a tenured associate professor of obstetrics and gynecology at Wayne State University. He had also been appointed by Governor Milliken to the Medical Licensure Board. As a member of this board he was responsible for determining what examinations should be required before a doctor could practice medicine and disciplining physicians who were not practicing properly or who were not following rules and regulations. He currently had staff privileges at Detroit Receiving, Hutzel, Harper-Grace, and Southwest General Hospitals. He had had staff privileges at Kirwood Hospital and St. Joseph Mercy. Osteopathic obstetric gynecologists also had priviledges at Harper-Grace, Kirwood, Southwest General and St. Joseph Mercy.

Dr. Vincent had been the department chair at Kirwood and was currently the department chair at Detroit Receiving. As the department chair it was his responsibility to see that the department functioned in compliance with rules and regulations as provided by the board of trustees of the institution. Dr. Vincent had been present at staff

meetings where cases were discussed and had engaged in dialogue with obstetric gynecologic osteopathic doctors regarding obstetrical care and management. Prior to Jamie Lynn's birth date, Dr. Vincent had worked with obstetric gynecologic osteopathic physicians. Also, there were osteopathic physicians in residency programs where Dr. Vincent was on staff.

Dr. Vincent stated that he was familiar with the osteopathic obstetric standard of care for vaginal delivery of breech presentations as of Jamie Lynn's birth date and that there was only one standard of care for all physicians. Dr. Vincent also noted that obstetricians and gynecologists who were osteopathic physicians and had written articles referred to the same text books that were used in allopathic institutions. Dr. Vincent admitted that he had discussed the standard of practice in general but had not specifically discussed breech presentation deliveries. The court, however, found this testimony insufficient to establish Dr. Vincent's knowledge of the osteopathic standard of care for breech vaginal deliveries.

Plaintiff's attorney did not present the testimony of Lee B. Stevenson, M.D., at trial as Stevenson would not have been able to meet the court's "narrow requirement of having discussions that he can specifically recall that he had had prior to September 8, 1980, with an osteopathic obstetrician-gynecologist, physician, regarding the obstetrical management of breech birth." Plaintiff's attorney noted that Stevenson would testify that for a number of years prior to Jamie Lynn's birth, he had served on the Michigan State Medical Society's Maternal Mortality Committee with an obstetric gynecologic osteopathic physician who had been trained in the osteopathic manner and had been an intern and resident in an osteopathic hospital. From discussions with this osteopathic

physician, Dr. Stevenson could testify that the osteopathic obstetrical gynecological standard for the care and management of breech births was the same as the allopathic obstetrical gynecological standard of care for breech births as of Jamie Lynn's birth date.

In applying the stated standard to the detailed facts above, we are forced to say that the trial court erred in determining that plaintiff's witnesses were not qualified to testify as to the osteopathic standard of care. An expert may base his knowledge of the applicable standard of care upon hearsay information from contact with other physicians.

The second issue deals with the "Good Samaritan" act, MCL 691.1502; MSA 14.563(12). Plaintiff argues that the trial court erred in determining that defendant Poston was within the protection of this act.

MCL 691.1502; MSA 14.563(12) provides:

> (1) In instances where the actual hospital duty of that person did not require a response to that emergency situation, a physician . . . who in good faith responds to a life threatening emergency within a hospital or other licensed medical care facility, shall not be liable for any civil damages as a result of an act or omission in the rendering of emergency care, except an act or omission amounting to gross negligence or wilful and wanton misconduct.
>
> (2) The exemption from liability under subsection (1) shall not apply to a physician where a physician-patient relationship existed prior to the advent of the emergency nor to a licensed nurse where a nurse-patient relationship existed prior to the advent of the emergency.

Under the facts of this case, we can not conclude that the trial court erred in its application of partial immunity pursuant to MCL 691.1502; MSA 14.563(12). There was no prior doctor-patient rela-

tionship between either plaintiff or Jamie Lynn and Dr. Poston. Dr. Poston was telephoned at home and informed that there had been a problem with the delivery: specifically, the baby was not breathing and would die if she did not receive immediate attention. Based on these facts it can be said that a "life threatening emergency" did exist.

A subissue plaintiff raises is that Dr. Poston was guilty of gross neglect or wilful and wanton misconduct and therefore not within the protection of the statute. To constitute wilful and wanton conduct, there must be evidence of:

> "(1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another." [*Gibbard v Cursan*, 225 Mich 311, 322; 196 NW 187 (1923).]

Wilful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or such indifference to whether harm will result as to be the equivalent of a willingness that it does. *Burnett v City of Adrian*, 414 Mich 448, 456; 326 NW2d 810 (1982).

In the instant case, there was absolutely no indication that Dr. Poston's acts or omissions in his treatment of Jamie Lynn Higgins were grossly negligent. The most plaintiff's proofs suggest was that Dr. Poston was guilty of ordinary negligence in misreading Jamie Lynn Higgins' x-rays and in performing a lumbar puncture. The trial court did not err in granting defendant Dr. Poston's motion for directed verdict on the basis of the Good Samaritan statute.

Reversed and remanded as to the first issue.