*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EUGENE PEREZ,

        Plaintiff-Appellee,

v

JOSHUA S. FALEY, D.P.M., and MICHIGAN
FOOT AND ANKLE, P.C.,

        Defendants-Appellants

and

WILLIAM BEAUMONT HOSPITAL, DANIEL
PETERSON, D.P.M., and JACOB MEISENBURG,
D.P.M.,

        Defendants.[1]

UNPUBLISHED
February 2, 2023

No. 359859
Wayne Circuit Court
LC No. 19-016317-NH

Before: HOOD, P.J., and CAMERON and GARRETT, JJ.

PER CURIAM.

Defendants Joshua S. Faley, DPM, and Michigan Foot and Ankle, PC appeal by leave granted[2] the trial court order denying their motion for summary disposition and alternative request

---

[1] Defendants Dr. Daniel Peterson, Dr. Jacob Meisenburg, and William Beaumont Hospital were dismissed by stipulation. Accordingly, when referring to "defendants" in this opinion, we will simply be referring to defendants Dr. Joshua S. Faley and Michigan Foot and Ankle, P.C. If necessary, we will refer to Dr. Peterson, Dr. Meisenburg, and Beaumont individually by name.

[2] *Perez v Faley*, unpublished order of the Court of Appeals, entered May 16, 2022 (Docket No. 359859).

-1-

for a hearing under *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). We affirm.

## I. BACKGROUND

This case originates from a podiatric procedure performed by Dr. Faley on plaintiff, Eugene Perez (Perez), related to stiffness in Perez's right big toe. In early May 2017, Perez visited Dr. Zachary Vaupel, an orthopedic surgeon, complaining of pain in both his big toes (though it was worse in his right big toe), and stiffness in his right calf. Dr. Vaupel diagnosed Perez with hallux rigidus (a stiff big toe) and gastrocnemius contracture, also referred to as a gastrocnemius equinus.[3] Dr. Vaupel recommended that Perez undergo a gastrocnemius recession (Strayer procedure) and arthrodesis, or fusion, of the first metatarsophalangeal joint (MPJ) in Perez's right big toe. Perez, however, wanted a second opinion, so he visited Dr. Faley in early June 2017.

When he saw Dr. Faley, Perez complained of pain in both big toes, with the right big toe pain worse than that in his left big toe. Upon examination, Dr. Faley noted that the joints of Perez's big toes were enlarged and had a significant loss of range of motion. Dr. Faley did not "appreciate any significant gastroc or gastrocsoleal equinus via Sil[f]verskoild examination." He did, however, diagnose Perez with hallux rigidus in both feet, as well as pain in both ankles. Dr. Faley agreed that arthrodesis was the "gold standard" procedure for hallux rigidus. But he also offered Perez the option of joint cheilectomy[4] and the placement of a Cartiva implant into the right foot first MPJ to achieve improved joint motion. Cartiva implants are a type of synthetic cartilage used to treat hallux rigidus.

Perez opted for the Cartiva implant. Dr. Faley and Perez discussed the surgical procedure, including risks and benefits, and Dr. Faley informed Perez that he may still require a fusion of the joint at a later time. In late August 2017, Dr. Faley performed a cheilectomy with a Cartiva implant on Perez's right MPJ. At first, the surgery appeared successful. Dr. Faley's notes indicate that throughout August 2017, Perez was doing well and not experiencing pain, although he had some limited range of motion of the joint. Perez even expressed a desire to proceed with surgical correction of his left big toe issues. By mid-September 2017, and into November 2017, however,

---

[3] Hallux rigidus means "stiff big toe" and is a type of degenerative arthritis affecting the metatarsophalangeal joint (MPJ) at the base of the big toe. Hallux rigidus is treated by surgery (typically by arthrodesis, i.e., fusion), or a cheilectomy, i.e., removal of the bony lump above the joint, with or without an implant device that replaces damaged cartilage.

A gastrocnemius contracture, also referred to as a gastrocnemius equinus, is a condition caused by a tight calf muscle. It alters the flexion of the ankle leading to an increased load bearing on the foot and ankle, especially the forefoot and MPJ. Treatment for gastrocnemius equinus includes use of a splint or brace, or surgery. Surgery on gastrocnemius equinus is referred to as a gastrocnemius recession or, more commonly, a Strayer procedure.

[4] A cheilectomy is a surgical option to relieve issues in the big toe joint caused by hallux rigidus. During such a surgery, surgeons remove bone spurs and tissue to relieve pain and create room in the toe joint to improve flexibility and range of motion.

Perez experienced pain "underneath the ball of [his] right foot" and had "difficulty pushing off of the right foot." He also experienced limited range of motion in his right big toe and had pain in his sesamoid apparatus.[5] Dr. Faley considered whether to remove the sesamoids or remove the Cartiva implant and perform an arthrodesis of the big toe joint. Perez wished to proceed with the Cartiva implant in his left foot, and Dr. Faley scheduled surgery on both of Perez's feet for mid-December 2017.

Dr. Faley performed several additional surgeries, including a surgical correction of the Cartiva implant in the right foot and implanting a Cartiva implant into Perez's left foot. Dr. Faley's "[i]ntraoperative findings showed recession[6] of the previously placed implant into the 1st metatarsal head." After initial improvement, by January 2018, Perez had increased pain and stiffness. Dr. Faley indicated Perez would likely need arthrodesis of his right first MPJ, and Perez appeared amenable to that procedure. Perez had no issues with the left foot Cartiva implant.

Perez did not return to Dr. Faley for the arthrodesis surgery. Instead, over a year-and-a-half later, in early November 2019, Perez returned to Dr. Vaupel, the orthopedic surgeon who initially saw Perez in May 2017, for the arthrodesis. Notes related to the surgery with Dr. Vaupel indicate Perez's diagnosis as right foot hallux rigidus, a painful implant in his right foot, and right side gastrocnemius equinus. During the November 2019 surgery, Dr. Vaupel removed the Cartiva implant from Perez's right foot, and performed a fusion of the right, first MPJ, and a right-side Strayer procedure. Dr. Vaupel's notes stated: "The Cartiva implant was identified and it was removed. It had sunk essentially into the shaft of the metatarsal."

In early December 2019, Perez sued defendants, as well as Beaumont, Dr. Meisenburg, and Dr. Peterson, raising three claims: (1) medical malpractice, (2), assault and battery (seemingly based on a lack of informed consent), and (3) negligence based on a theory of res ipsa loquitur. Perez's theory of causation was that Dr. Faley's treatment of Perez's hallux rigidus breached the standard of care. Perez specifically alleged that Dr. Faley's treatment breached the standard of care, in part, because he failed to perform a fusion of the first MPJ, the " 'gold standard' " for treating hallux rigidus, failed to perform a Strayer procedure to treat Perez's gastrocnemius equinus, and used a Cartiva implant, which was new to the United States.

Defendants answered the complaint and asserted several affirmative defenses, including that they did not breach any duties and were not negligent toward Perez. In mid-October 2021, defendants moved for summary disposition under MCR 2.116(C)(10) and alternatively requested that the trial court hold a *Daubert* hearing regarding Perez's theory of causation if it felt summary disposition was inappropriate. Defendants argued summary disposition was proper because Perez's theory of causation, that Dr. Faley breached the applicable podiatry standard of care by

---

[5] In this context, the sesamoids are two small bones located at the joint at the base of the big toe, on the bottom of the foot. They sit in two small grooves and are stabilized by a triangle-shaped ligament. The sesamoid bones help form the sesamoid apparatus, which is essentially a pulley system for the muscles that move the toe towards the ground when you walk. Additionally, they assist the big toe in bearing the forces associated with walking.

[6] "Recession" in this context is the withdrawal of a part from its normal position.

using a Cartiva implant to treat Perez's condition, was not supported by admissible evidence. Defendants also argued that Perez's theory was not derived from reliable scientific knowledge and principles, as required by MRE 702 and MCL 600.2955. They asserted that Perez's causation expert, Dr. Sheldon Goldstein, DPM, a podiatrist, did not have sufficient experience and failed to provide a scientific basis for his opinions. Defendants, therefore, argued that Dr. Goldstein's opinion testimony was inadmissible under MRE 702 and MCL 600.2955.

Perez responded to defendants' dispositive motion and request for a *Daubert* hearing. He asserted that Dr. Goldstein had sufficient experience and scientific support to render his opinions admissible under MRE 702 and MCL 600.2955. Perez addressed each of defendants' challenges to the admissibility of Dr. Goldstein's testimony. He argued that, under Michigan law, Dr. Goldstein was not required to have experience with performing a specific procedure and it was enough for Dr. Goldstein to have performed similar procedures and be generally familiar with the specific procedure at issue. Perez also argued there was sufficient evidence supporting Dr. Goldstein's opinion that Perez suffered from a gastrocnemius equinus. Perez further asserted that, contrary to defendants' argument, Dr. Goldstein offered a scientific basis for his opinion that the presence of a gastrocnemius equinus is a reason to not perform an implant surgery. Finally, Perez argued that Dr. Goldstein offered a scientific rationale for his opinion that the design of the Cartiva implant was flawed and increased the risk of failure in a patient like Perez. Perez argued that Dr. Goldstein's opinion testimony was based on facts in evidence and recognized principles of medicine and anatomy, "rationally derived from a sound foundation," and, accordingly, admissible under Michigan law. Perez, therefore, requested that the trial court deny defendants' motion for summary disposition or, alternatively, request for a *Daubert* hearing.

After a hearing on defendants' motion, the trial court concluded that summary disposition was inappropriate and a *Daubert* hearing was unnecessary. The court found that Dr. Goldstein was board certified and that "[t]his [was] within his area of specialty." It noted Dr. Goldstein's testimony about his "experience performing these procedures and his limited experience with this device in question and why he found it to not be appropriate to deal with" Perez's condition. But the court did not conclude that rendered Dr. Goldstein's opinion "not scientifically sound to warrant it to be inadmissible . . . ." The court also found it did not "rise[] to the level that even a [*Daubert*] hearing is appropriate." The trial court found that Dr. Goldstein's opinion was that he found the Cartiva implant "untrustworthy, based on his experience with it, and also as it relates to the particular condition that this patient presented with." The trial court further stated that it did not "know if when I'm performing my gatekeeper function at this juncture if I am to discard it as not being scientifically sound." The court, therefore, found that defendants' concerns about Dr. Goldstein's testimony "go to the weight that a factfinder is to give it, not the admissibility of it." After the hearing, the trial court entered an order denying defendants' motion "for the reason stated on the record."

Defendants applied for leave to appeal the trial court's order denying their motion for summary disposition or, alternatively, request for a *Daubert* hearing. This Court granted defendants' application for leave to appeal, entering an order limiting the appeal to the issues raised in the application and supporting brief. *Perez v Faley*, unpublished order of the Court of Appeals, entered May 16, 2022 (Docket No. 359859).

## II. STANDARDS OF REVIEW

-4-

In *Shivers v Covenant Healthcare Sys*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket Nos. 351638, 351795, 351863); slip op at 3 (quotation marks and citations omitted), this Court summarized the standard for reviewing issues related to the admission of evidence as follows:

> A trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo. The admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion. To the extent a trial court's decision relies on factual findings, this Court reviews those factual findings for clear error, meaning it defers to the trial court unless definitely and firmly convinced the trial court made a mistake. This Court otherwise reviews de novo the trial court's determinations of law; but any factual findings made by the trial court in support of its decision are reviewed for clear error, and ultimate discretionary decisions are reviewed for an abuse of that discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes. This Court reviews de novo the interpretation and application of court rules.

The applicable standard of care in a medical malpractice action is a question of law that we review de novo. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 16 n 16; 651 NW2d 356 (2002). After the proper standard of care is determined as a matter of law, we "review[] for an abuse of discretion a trial court's rulings regarding the qualifications of proposed expert witnesses to testify regarding the specifics of the standard of care and whether the standard has been breached." *Id.* (citation omitted). This Court reviews for an abuse of discretion a trial court's decision to conduct a *Daubert* hearing. *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013).

This Court reviews de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion under MCR 2.116(C)(10) "tests the factual sufficiency of a claim." *Id.* at 160 (citation and emphasis omitted). In considering a motion under MCR 2.116(C)(10), the trial court "must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id.* (citation omitted). Such a motion "may only be granted when there is no genuine issue of material fact." *Id.* (citation omitted). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id.* (quotation marks and citation omitted).

## III. LAW AND ANALYSIS

### A. ADMISSIBILITY OF EXPERT TESTIMONY

Defendants first argue that Dr. Goldstein's testimony regarding the standard of care and whether Dr. Faley's use of the Cartiva implant breached that standard of care was unreliable and, therefore, was inadmissible. We disagree.

A medical-malpractice claim "arises during the course of a professional relationship and involves a question of medical judgment." *Lockwood v Mobile Med Response, Inc*, 293 Mich App

17, 23; 809 NW2d 403 (2011), citing *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 43; 594 NW2d 455 (1999). "A plaintiff in a medical malpractice action must establish (1) the applicable standard of care, (2) breach of that standard by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and citation omitted).

The standard of care refers to "[w]hat the defendant must do, or must not do." *Moning v Alfono*, 400 Mich 425, 437-438; 254 NW2d 759 (1977). A breach of the standard of care is a deviation from that standard. See *Martinez v Redford Community Hosp*, 148 Mich App 221, 230; 384 NW2d 134 (1986).[7] The standard of care is determined by the community of practitioners. For specialists, that is usually national; for generalists, that is usually local or statewide. See *Cox*, 467 Mich at 17 n 17. See also MCL 600.2912a(1).[8] In Michigan, podiatrists are considered general practitioners, not specialists. See *Jalaba v Borovoy*, 206 Mich App 17, 21-22; 520 NW2d 349 (1994). Perez, therefore, had to present an expert witness able to testify that

> [t]he defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury. [MCL 600.2912a(1)(a).]

"An expert familiar with the standard of care in a community may testify concerning the standard of care in that community, although he has not practiced in the community." *Bahr v Harper-Grace Hosps*, 448 Mich 135, 141; 528 NW2d 170 (1995).

"Generally, expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard." *Elher*, 499 Mich at 21. "Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community." *Decker v Rochowiak*, 287 Mich App 666, 686; 791 NW2d 507 (2010) (quotation marks and citation omitted). "A party offering the testimony of an expert witness must demonstrate the witness' knowledge of the applicable standard of care." *Id*. at 685-686 (quotation marks and citation omitted). An expert's testimony may not be based on mere speculation, and there "must be facts in evidence to support the opinion testimony of an expert." *Teal v Prasad*, 283 Mich App 384, 395; 772 NW2d 57 (2009) (quotation marks and citation omitted).

---

[7] Although *Martinez* is not strictly binding pursuant to MCR 7.215(J)(1) because it was issued before November 1, 1990, as a published opinion, it nevertheless "has precedential effect under the rule of stare decisis" pursuant to MCR 7.215(C)(2).

[8] The parties do not appear to argue that Dr. Goldstein relied on the wrong standard of care. Further, the distinction between local and national communities is, at times, overstated. Compare *Jalaba v Borovoy*, 206 Mich App 17, 22; 520 NW2d 349 (1994) with *Cox*, 467 Mich at 17 n 17.

MRE 702 and MCL 600.2955 govern the admissibility of opinion testimony, or expert testimony. *Elher*, 499 Mich at 21-22. The trial court may admit expert testimony only once the trial court "ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "MRE 702 incorporates the standards of reliability . . . articulated in *Daubert*[,]" and requires the trial court to determine that each aspect of a proposed expert witness' testimony is reliable. *Elher*, 499 Mich at 22. MRE 702 states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In addition to MRE 702, in a medical malpractice action, the trial court must consider the factors listed in MCL 600.2955(1) when evaluating whether an expert's opinion and its basis are reliable. *Elher*, 499 Mich at 22-23. MCL 600.2955(1) provides:

> In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.
>
> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.
>
> (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

Here, Dr. Goldstein, Perez's expert witness, was a board-certified podiatrist who served as the chief of podiatric medicine at McLaren Oakland Hospital for almost 40 years, and had nearly five decades of experience performing various podiatric procedures. Although he did not have vast experience with the Cartiva implant, he had performed other podiatric procedures, including arthrodesis and implants, and was familiar with various conditions involving the joints and bones of the feet. He also testified that he performed a workshop with a Sawbones[9] model and the Cartiva implant to evaluate its efficacy. This was the same type of training methodology that Dr. Faley received for the Cartiva implant. Dr. Goldstein testified that the standard of care for a podiatrist was the "treatment a podiatric physician renders that is as compared to other podiatric physicians in the state that the podiatrist is practicing in and nationwide taking into consideration the same and similar education, podiatric medical school, same or similar education and residency training and same and similar patterns of practice." Although when asked whether the standard of care for podiatrists was a local or national standard, Dr. Goldstein stated it was "both" but "more leaning towards national," he indicated he was "applying it to both." He also affirmed that the manner in which arthrodesis, Cartiva implants, or any other first MPJ implant is performed is done the same throughout the nation. See *Leblanc v Lentini*, 82 Mich App 5, 17; 266 NW2d 643 (1977) (holding that "in some cases, local standards might be uniform throughout the United States"; acknowledging that "there are certain areas in connection with medicine that are so well known that . . . any expert could testify as to that standard of practice" and "there are areas of medicine so well known and taught [that they] are commonplace in every locality, every community both large and small in the entire United States [and] if this is one of those situations, then of course . . . [the Court] will permit the doctor to testify.").

Regarding the Cartiva implant, Dr. Goldstein testified that the implant's flaw was that it had no support. He stated: "It has no supportive appendages. It has no support in its design to anchor it into subchondral bone to prevent it from moving." He based this opinion on "[c]ommon sense in my experience with implants in the anatomy of the bone" and verified it "by the research that [he] did." He explained that this opinion was based on "knowledge that I know based on the anatomy of the first metatarsal bone and how implants function physiologically in their integration during the osteogenesis process." As noted earlier, Dr. Goldstein also testified about his workshop process. He explained that when he received a new product, he and his residents performed a "workshop," which allowed them to "develop an opinion regarding the ease with which something can be used." The workshop also allowed them to "develop critical thought" and take "into consideration the anatomy, say the structure that's going to be operated on, does this particular new instrument, does it take care of the problem without any collateral damage." Dr. Goldstein testified that, in the workshop, he tried the Cartiva implant on a Sawbone medical model, not a cadaver or live patient, just once. He affirmed that he did not like the Cartiva implant because it

---

[9] Sawbones is a company that produces and sells medical models for orthopedic and medical education. The models are designed to replicate real bone to be used to practice various procedures within orthopedic surgery. Sawbones, *About Us* <https://www.sawbones.com/about-us> (accessed January 4, 2023).

was not stable enough. Dr. Goldstein also provided a detailed explanation of the physiology of the foot and how the Cartiva implant worked. He believed that Dr. Faley, in choosing to use the Cartiva implant, failed to "take into consideration the anatomy of the bone." Dr. Goldstein indicated that, in reviewing this case, he performed research and "gather[ed] evidence-based articles to verify [his] opinions," and a substantial amount of his opinion about why the Cartiva implant was unsuitable for a patient like Perez stemmed from his education, training, and experience as a podiatrist for almost 50 years.

Dr. Goldstein also opined that the Cartiva implant was not advisable for Perez because, in addition to the flawed design, Perez had a gastrocnemius equinus. Contrary to defendants' assertions, this portion of Dr. Goldstein's opinion is supported by evidence. Dr. Vaupel diagnosed Perez with a gastrocnemius equinus in May 2017, just a month before Perez visited Dr. Faley. Dr. Faley's records fail to support a finding that Perez did not have a gastrocnemius equinus, as defendants claim. Instead, as Perez notes, Dr. Faley's records indicate that Dr. Faley did not appreciate *significant* gastrocnemius equinus. Based on that finding, a gastrocnemius equinus may still have been present, it seemingly was just not significant enough to Dr. Faley. And based on Dr. Goldstein's conclusion that Perez had a gastrocnemius equinus, he opined that an uncorrected gastrocnemius equinus would "add to the load on that first MPJ and the hallux, and whatever implant is there could be loosened up because there's additional load that doesn't have to be on the first MPJ if the gastrocnemius was lengthened and the equinus was corrected."

Defendants argue that Dr. Goldstein's opinion testimony was unreliable, in part, because he did not cite any literature supporting his conclusion about the standard of care in this case. But this argument fails to acknowledge that the trial court's duty as gatekeeper is to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert*, 509 US at 597," and the inquiry is a "flexible one" that focuses "solely on principles and methodology, not on the conclusions that they generate," *id*. at 594-595. This inquiry has as its "overarching subject" "the scientific validity and thus the evidentiary relevance and reliability— of the principles that underlie a proposed submission." *Id*. The trial court properly conducted this inquiry when it evaluated the reliability of Dr. Goldstein's opinion testimony.

Particularly relevant here is our Supreme Court's recognition that "it is within a trial court's discretion how to determine reliability." *Elher*, 499 Mich at 25. The relevancy of the *Daubert* factors in assessing reliability may be affected by "the nature of the issue, the expert's expertise, and the subject of the expert's testimony." *Id*. at 24-25. And, importantly, "in some cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Id*. at 25. This case is one such case where the most relevant reliability concern is Dr. Goldstein's experience as a podiatrist in performing various podiatric procedures over the course of nearly 50 years, and the application of general principles of anatomy and surgery to avoid using an implant in a patient with a condition that could increase the amount of pressure on the implant in a way that increased the risk of failure of the implant. Although Dr. Goldstein may not have had expertise with this particular implant, when dealing with the admission of expert testimony, gaps and weaknesses in the witness's expertise present a subject for cross-examination, and address the weight of the testimony, not its admissibility. See *Wischmeyer v Schanz*, 449 Mich 469, 480; 536 NW2d 760 (1995). See also *Albro v Drayer*, 303 Mich App 758, 763; 846 NW2d 70 (2014) ("Admission of expert testimony simply does not depend on an expert being *exactly as knowledgeable* as a defendant in a medical malpractice action.") (Emphasis in original). It is especially notable that

at least one of Dr. Goldstein's methodologies—the Sawbones training—was the same method used to train Dr. Faley. Accordingly, the trial court did not abuse its discretion by finding that Dr. Goldstein was, at a minimum, sufficiently knowledgeable, trained, and educated to form an expert opinion under MRE 702 or MCL 600.2955.

## B. REQUEST FOR A *DAUBERT* HEARING

Defendants also argue that the trial court should have, at a minimum, granted a *Daubert* hearing to evaluate Dr. Goldstein's reliability as an expert and the ultimate admissibility of his testimony. We disagree.

The trial court's determination regarding whether to conduct a *Daubert* hearing to evaluate the admissibility of Dr. Goldstein's expert testimony was within its discretion. *Lenawee Co*, 301 Mich App at 162. As the United States Supreme Court has held, a "trial judge [has] the discretionary authority needed . . . to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted . . . ." *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999). And to the extent defendants argue that Dr. Goldstein's principles and methodologies are not sufficiently reliable such that his testimony was inadmissible, the trial court's role as gatekeeper is not to determine whether an expert's testimony is *correct*; rather, the court must determine whether it relies on reliable principles and methods. See *Chapin v A&L Parts, Inc*, 274 Mich App 122, 139; 732 NW2d 578 (2007) (indicating that the proper inquiry "is not into whether an expert's opinion is necessarily correct or universally accepted" but, rather, it is "into whether the opinion is rationally derived from a sound foundation."). In determining that Dr. Goldstein's testimony was admissible, and that a *Daubert* hearing was unnecessary, the trial court noted that the procedure at issue in this case was within Dr. Goldstein's specialty, and that he had years of experience and training related to various podiatric procedures. The trial court, in exercising its discretion to decline to conduct a *Daubert* hearing, found that Dr. Goldstein's testimony was sufficiently reliable. This decision was not outside the range of principled outcomes. Accordingly, the trial court did not abuse its discretion in declining to hold a *Daubert* hearing.

## C. SUMMARY DISPOSITION

Defendants argue that summary disposition was improperly denied because there was insufficient evidence to support Perez's theory that Dr. Faley breached the standard of care by implanting the Cartiva device. We disagree.

Defendants' arguments on appeal are premised on Dr. Goldstein's expert testimony being inadmissible. The trial court, however, did not abuse its discretion by finding that Dr. Goldstein's testimony was reliable and admissible under MRE 702 and MCL 600.2955. Given that conclusion, there is a factual dispute regarding whether Dr. Faley breached the standard of care by implanting the Cartiva device.

Defendants argue that there was no evidence Perez had a gastrocnemius equinus and, even if he did, the "contraindications to performing a Cartiva implant identified by the manufacturer of Cartiva" did not include a gastrocnemius equinus condition. Defendants are wrong for at least three reasons. First, as noted earlier, there was evidence that Perez had a gastrocnemius equinus

condition. Dr. Vaupel specifically diagnosed Perez with a gastrocnemius equinus a month before Perez saw Dr. Faley, and Dr. Faley's findings did not explicitly rule out the presence of a gastrocnemius equinus condition. Second, Dr. Goldstein's admissible testimony suggests that gastrocnemius equinus was a reason to not implant a Cartiva device. Specifically, Dr. Goldstein testified that the presence of a gastrocnemius equinus could negatively impact the effectiveness of a Cartiva implant to the point that it caused the implant to fail. Third, and relatedly, although gastrocnemius equinus is not explicitly listed on the contraindications for the Cartiva implant, the list includes "[p]hysical conditions that would tend to eliminate adequate implant support . . . ." Dr. Goldstein's testimony regarding the effect of gastrocnemius equinus on the Cartiva implant arguably falls within this definition, suggesting that gastrocnemius equinus was, in fact, a contraindication for the Cartiva implant. Accordingly, there is a question of fact regarding whether gastrocnemius equinus was a contraindication for the use of a Cartiva implant. As such, there is a factual dispute regarding whether Dr. Faley breached the standard of care by implanting the Cartiva device when there was evidence that Perez had a gastrocnemius equinus condition. The trial court, therefore, did not err in denying defendants' motion for summary disposition.

We affirm.


/s/ Noah P. Hood
/s/ Kristina Robinson Garrett

-11-